George H. W. BUSH et al., Plaintiffs,

v.

Crawford MARTIN, Secretary of State of the State of Texas, John Connally, Governor of the State of Texas, Waggoner Carr, Attorney General of the State of Texas, et al., Defendants.

Civ. A. No. 63–H–266.

United States District Court
S. D. Texas,
Houston Division.

Jan. 5, 1966.

Noel, J., dissented in part.

See also D.C., 224 F.Supp. 499, affirmed 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656.

Wm. B. Cassin, Houston, Tex., for plaintiffs.

Waggoner Carr, Atty. Gen., and Hawthorne Phillips, Austin, Tex., Patrick B. Gibbons, Dallas, Tex., Will D. Davis, Austin, Tex., Chas. F. Mitchell, Houston, Tex., for defendants.

Duncan E. Boeckman, Pat S. Holloway, Dallas, Tex., for intervenors.

Neil Caldwell, Angleton, Tex., pro se.

Paul B. Haring, Goliad, Tex., pro se.

Franklin S. Spears, San Antonio, Tex., for Senator Franklin Spears, Senator Don Kennard and Sterling Steves, amici curiae.

Before BROWN, Circuit Judge, and INGRAHAM and NOEL, District Judges.

JOHN R. BROWN, Circuit Judge:

■ The question is whether the Texas 1965 Congressional Redistricting Act, enacted after our conditional decree holding Vernon's Tex.Rev.Civ.Stat.Ann. art. 197a unconstitutional, is constitutional. We hold that this new Act represents a substantial good faith effort by Texas toward the constitutional goal of population equality and is therefore valid at this time. Consequently, the injunction against its enforcement is denied, but by suitable declaratory order further jurisdiction is retained.

1. Tex.Laws 1965, ch. 349, at 743 [Tex. Rev.Civ.Stat.Ann. art. 197b]. The Act was approved by the Governor on June 9, 1965 and became effective on August 30, 1965.

2. This number was fixed pursuant to the statement transmitted to Congress by

## THE NEW 1965 ACT

Although in some respects, it is putting cart before horse, it is helpful, we think, to describe the new Act, H.B. 67.[1] It is this Act which must meet the standards to be discussed at length. And it is this congressional districting plan which must be matched against the contentions pro and con.

■ Texas is allotted 23 congressmen.[2] With a total population[3] of 9,-579,677, the average or Ideal for each district is 416,508. The configuration of the 23 districts and their constituent counties is reflected by the map, Appendix A. As shown by the detailed population analysis of congressional districts established by H.B. 67,[4] in terms

the President following publication of the 1960 decennial census. 2 U.S.C.A. § 2a.

3. 1960 census figures are used throughout except where otherwise indicated.

4.

## POPULATION ANALYSIS OF CONGRESSIONAL DISTRICTS
### H.B. 67

| | | DEVIATION FROM IDEAL | | PERCENTAGE DEVIATION FROM IDEAL | |
| (a) DISTRICT | (b) POPULATION | (c) OVER | (d) UNDER | (e) OVER | (f) UNDER |
|---|---|---|---|---|---|
| 1 | 378,334 | | 38,174 | | 9.2 |
| 2 | 387,794 | | 28,714 | | 6.9 |
| 3 | 410,622 | | 5,886 | | 1.4 |
| 4 | 411,041 | | 5,467 | | 1.3 |
| 5 | 417,174 | 666 | | 0.2 | |
| 6 | 382,639 | | 33,869 | | 8.1 |
| 7 | 417,283 | 775 | | 0.2 | |
| 8 | 408,479 | | 8,029 | | 1.9 |
| 9 | 457,092 | 40,584 | | 9.7 | |
| 10 | 456,301 | 39,793 | | 9.6 | |
| 11 | 389,954 | | 26,554 | | 6.4 |
| 12 | 438,578 | 22,070 | | 5.3 | |
| 13 | 381,829 | | 34,679 | | 8.3 |
| 14 | 456,742 | 40,234 | | 9.7 | |
| 15 | 418,183 | 1,675 | | 0.4 | |
| 16 | 394,679 | | 21,829 | | 5.2 |
| 17 | 376,200 | | 40,308 | | 9.7 |
| 18 | 394,582 | | 21,926 | | 5.3 |
| 19 | 425,517 | 9,009 | | 2.2 | |
| 20 | 449,303 | 32,795 | | 7.9 | |
| 21 | 453,334 | 36,826 | | 8.8 | |
| 22 | 417,396 | 888 | | 0.2 | |
| 23 | 456,621 | 40,113 | | 9.6 | |
| | | 265,428 | 265,435 | | |

of population the largest overage from the Ideal is 40,584 (Dist. 9), and the greatest underage is 40,308 (Dist. 17). In terms of percentage, the variation is 9.7% above and 9.7% below the Ideal for an aggregate deviation of 19.4%. Of the 23 districts, 6 vary more than 9% plus or minus,[5] 3 others vary more than 8%,[6] and 6 others vary more than 5%.[7] Thus, more than half (15) of the districts vary more than 5% from the Ideal, and the average deviation[8] of all of the districts is 5.5%. The ratio of the population of the smallest district to that of the largest district is 1:1.22, and this, of course, is also the ratio of the relative voting strength of these districts' residents. And as one might expect for Texas, in terms of people perhaps affected the aggregate population figures are large: 265,428 people are placed in the wrong districts from the standpoint of equality, and what is worse, 5,263,479 Texans are underrepresented by virtue of their residence in overpopulated districts.[9]

### THE PRIOR PROCEEDINGS

In October 1963 this Court declared the predecessor statute, Art. 197a, unconstitutional based on disparities that ran from 128% above to 48% below the Ideal.[10] Bush v. Martin, S.D.Tex., 1963, 224 F.Supp. 499. We enjoined the use of Art. 197a in the nomination and election of Members of Congress in the forthcoming 1964 elections. We prescribed that unless valid legislation was enacted, all such candidates would be elected at large.[11] 224 F.Supp. at 517 (decree). However, because our view was expressly contrary to that of the 3-Judge Court in Georgia which was shortly to be argued in the Supreme Court,[12] we deferred the effective date of our order to enable the State of Texas to apply for a stay from the Circuit Justice. Such a stay was granted. Shortly on the heels of its February 17, 1964, decision in Wesberry v. Sanders, 1964, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481, the Supreme Court on March 2, 1964, by per curiam decision affirmed our order. Martin v. Bush, 1964, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656. But the affirmance was "without prejudice to the right of the appellants [State officials] to apply by April 1, 1964, to the District Court for further equitable relief in light of the present circumstances including the imminence of the forthcoming election and 'the operation of the election machinery

---

5. Dists. 1, 9, 10, 14, 17, 23.

6. Dists. 6, 13, 21.

7. Dists. 2, 11, 12, 16, 18, 20.

8. This factor, although frequently discussed by the parties, is of limited significance since each district must be compared with the other separate districts, not just an average. An all-district average is, however, reflected in the theoretical minimum percentage of voters required to elect a majority (12) of the State's congressmen, here 49.41%. But even this figure may be of doubtful significance in assaying congressional reapportionment: " * * * [I]t is much more difficult, if not impossible, to demonstrate that the voters in the underrepresented Congressional Districts, as would be true of the voters in an underrepresented State legislative district, are outnumbered through a majority of Congressional Representatives elected by a minority of the population." Bush v. Martin, S.D.Tex., 1963, 224 F.Supp. 499, 514. But see notes 87, 88, infra and accompanying text.

9. This is the total population of over districts, cols. (c) and (e), note 4, supra.

10. The Ideal was computed, as under H.B. 67, by dividing the 1960 census figure by the twenty-three congressmen allotted to Texas, although under Tex.Rev.Civ.Stat.Ann. art. 197a only twenty-two congressmen were elected from districts and one was elected at large.

11. The decree of October 19, 1964, prescribed:
 "THIRD: Pending enactment by the State of Texas of substitute legislation in the place of said Art. 197a, all Members of Congress for the State of Texas shall be nominated and elected from the State at large; * * *
 "FIFTH: The Court retains jurisdiction of the cause for such other and further orders as may be required."

12. Wesberry v. Vandiver, N.D.Ga., 1962, 206 F.Supp. 276, rev'd sub nom. Wesberry v. Sanders, 1964, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481.

of Texas' noted by the District Court in its opinion." The stay was likewise continued in effect pending disposition by this Court of any applications for equitable relief.

The election officials of the State of Texas, as permitted, filed the application for relief and after a pretrial an extensive factual hearing was held [13] at which extensive evidentiary material was received. Of unusual importance now, the testimony included that of Robert E. Johnson, Executive Director of the Texas Legislative Council.[14] Mr. Johnson pointed out in great detail the numerous mechanical problems in undertaking the required wholesale redrawing of district lines and, more significant, the TLC's plan to conduct state-wide hearings [15] to ascertain, so far as legally relevant, the wishes of the people, their comments, suggestions, and objections.

At the conclusion of that hearing, this Court for reasons extensively, but orally, stated (and not published as an opinion) [16] concluded that in balancing these equities, the effective date of our injunction should be further stayed. By the formal order of April 1, 1964, we stayed the declaration of unconstitutionality until January 11, 1965, to enable Congressmen elected in November 1964 under the old Act (Art. 197a) to take their seats. This likewise postponed the judicial repeal of Art. 197a to a date subsequent to the convening of the Texas 59th Legislature regular session. We also prescribed that the Legislature should have until August 1, 1965, to enact valid legislation as a substitute for Art. 197a, and in the absence of which we then declared that all candidates for Congress in the 1966 election would run at large.[17] As we had before, we granted a temporary stay of the effective date of that order for a period of seven days to enable the plaintiffs to seek a stay from the Circuit Justice or the Supreme Court. This stay was denied. Now the stage was set for the legislative action which is here attacked.

## THE TEXAS LEGISLATURE ACTS

Following our conclusion that the Legislature should be accorded the first opportunity of redistricting Texas, see note 16, supra, the TLC, at the request of the Governor, undertook to study in depth the problem of congressional redistricting. Under its auspices, a Study Com-

13. March 27 through March 31, 1964.

14. We refer to it as TLC. This is an agency of the Legislature of the State of Texas whose responsibilities include legislative studies and drafting of proposed legislation. Tex.Rev.Civ.Stat.Ann. art. 5429b. The TLC is composed of five Senators and ten Representatives, with the President of the Senate and the Speaker of the House serving as Chairman and Vice-Chairman, respectively. Since the Texas Legislature does not retain committee counsel, the TLC's role in laying the ground work for state legislation cannot be emphasized too much. Likewise, since the Legislature does not regularly report debates or committee hearings, the TLC's published studies are often a valuable source of legislative history.

15. See Tex.Rev.Civ.Stat.Ann. art. 5429b, § 5.

16. April 1, 1964.

17. The decree expressly modified our order of October 19, 1964 (see note 11, supra):

"*ONE:* The effective date of the Order is hereby postponed to January 11, 1965.

"*TWO:* In reserving jurisdiction in Par. FIFTH the Court expressly reserves jurisdiction to provide such remedies as it may consider appropriate to meet the requirements of the United States Constitution unless appropriate, valid legislation is enacted by the State of Texas prior to August 1, 1965.

"*THREE:* Paragraph THIRD of the Order is amended to read as follows:

"The Court further declares that in the absence of enactment by the State of Texas of valid substitute legislation in the place of said Art. 197a, or of appropriate, valid orders of the Court under reserved power in Par. TWO above, the applicable laws of the United States of America provide for the election of all Members of Congress for the State of Texas from the State of Texas at large rather than by District."

mittee held hearings in seven cities in distinctive geographical areas of the State, including all of the major metropolitan areas which precipitated much of the problem. By advance publicity, it encouraged interested citizens to appear and offer views including specific proposed plans. The record of these hearings (an exhibit in our case) was available to all members of the Legislature and its committees. Based on these hearings and its study of the problem, the TLC prepared a formal report,[18] a copy of which was furnished to each member of the Legislature. The "Summary Report" which forms a major portion of this document reflected a detailed outline of the factors considered by the TLC. These included a discussion of the Federal Court decisions, the initial decision of this Court, 224 F.Supp. 499, and policy considerations. These in turn included, as discussed, the absence of specific guidelines in the judicial decisions, the difficulty of assuring representation to all in a geographical area of such vast size and distances, the joinder or splitting of some counties contrary to long established custom and legislation, the pairing of some incumbent congressmen in the same district, and the mechanical problems of drawing lines and shifting counties in and out of former groupings.

On the basis of this study, the Study Committee, by a report which the TLC formally approved and adopted, made a number of specific recommendations. It urged, first, that Texas Legislature face up to its responsibility, leaving it neither to the Court by default nor to Congress. And then with the principal aim of population equality, it expressed the hope that counties be divided only to solve the problem in metropolitan areas, district lines be drawn to make geographical areas as small as possible, and that variations from the absolute standard have a reasonably persuasive basis.[19]

Without undertaking to exercise legislative functions, the TLC also submitted two specific proposals called Plans A and B with accompanying maps and, of un-

18. Tex. Legislative Council, Congressional Redistricting (Report No. 58-2, December 1964). [We cite it as TLC Congressional Redistricting].

19. TLC Congressional Redistricting 3-4: "Your committee respectfully submits the following recommendations:

1. That a congressional reapportionment Act be passed prior to August 1, 1965, in compliance with the court order.

2. That the legislature not postpone action on this matter in the futile hope that Congress will take some remedial action prior to the effective date of the order.

3. That the district populations be made as equal as possible and that all variations from the absolute standard have some reasonable basis that would be convincing to the court.

4. That the legislature divide only those counties which have population sufficient for more than one member of Congress. Only Bexar, Tarrant, Harris, and Dallas counties fall into this classification.
 a. That Harris County be divided into three congressional districts.
 b. That Dallas County have two congressmen and its excess population joined to a contiguous district or districts.
 c. That Bexar County have one congressman wholly within that county and its excess population joined to a contiguous district or districts.
 d. That Tarrant County have one congressman wholly within the county and its excess population joined to a contiguous district or districts.

5. That in drawing district lines the legislature attempt, within the population limitation, to make the geographic area of a district as small as possible.

6. That the legislature use the 1960 census as the source of population figures for an apportionment plan.

7. That in drawing district lines the legislature make every reasonable effort to avoid placing two incumbents in the same district.

8. That in all stages of work on the reapportionment bill the legislature keep a reasonable detailed legislative history which could be used to show the federal court in Houston the considerations of the legislature."

usual importance, the district lines for the metropolitan areas of Dallas, Houston, San Antonio, and Fort Worth.[20] The Plaintiffs[21] emphasize in their briefs that under Plan A only 3 districts varied more than 4% from the Ideal, one of which varied 4.2%, one 5.2%, and a third 7.4%, with an average deviation of 2.05%. Under Plan B only 5 districts varied more than 4% from the Ideal, one of which varied 4.5%, two 4.8%, and two 5%, for an average deviation of 2.26%.

In briefly summarizing the activities in the legislative process, it is an undeniable fact, as the Plaintiffs emphasize so greatly, that the Act under attack was the product of intense activity in the closing days of the regular session which would mandatorily terminate on May 31, 1965.[22] Of course our decree did not compel this haste as our deferred date of August 1, 1965, was deliberately selected to permit more than one special session of 30 days to be convened.[23]

In that legislative process, several members of the House sponsored specific plans having quite low percentage deviations from the Ideal.[24] More significantly, the House actually passed a bill on May 5, 1965.[25] The maximum variation was 5.64% over and 5.24% under, with only 4 districts in excess of 4%, and the average deviation 1.81%.[26] In the Senate, where the principal work appears to have been done in the committee, the Bill, as amended, passed on May 26, 1965.[27] That Bill was also quite low in

20. Taking cognizance of contemporary facts of life that the city has swallowed up the county of which it is a part, we refer indiscriminately to these metropolitan areas as:

| City | County |
|------|--------|
| Houston | Harris |
| Dallas | Dallas |
| Fort Worth | Tarrant |
| San Antonio | Bexar |

21. We use the term Plaintiffs to include all complainants, both the original plaintiffs and the numerous intervenors. See text accompanying note 37, infra.

22. Tex.Const. art. III, § 5, Vernon's Ann. St.

23. This may be done by the Governor by a proclamation stating the purpose for which the Legislature is to be convened. Tex.Const. art. IV, § 8. A special session cannot last longer than 30 days. Tex.Const. art. III, § 40.

24.

| Sponsor | Bill No. | Deviations |
|---------|----------|------------|
| Richardson | HB 664 | One district varied 2.8%; no other varied in excess of 1.5% |
| Cahoon | HB 734 | One district varied 2.1%, 1 by 2%, the balance by less than 2% (average 1.06%) |
| Eckhardt | HB 42 | No district varied in excess of 1.5% |
| Sherman | HB 360 | No district varied in excess of 3%; only 3 by that much |
| Johnson | HB 878 | One district by 4%, 1 of 3%, balance 2% or less |

See also in the Senate:

| | | |
|---|---|---|
| Spears-Kennard Substitute | | No district varied in excess of 2%; only 7 varied more than 1% |

25. Tex.H.R.Jour., May 5, 1965, at 1848.

26. For analysis of this plan, see Appendix B.

27. Tex.S.Jour., May 26, 1965, at 1963.

deviations, with a maximum of 7.68% over and 4.48% under, and an average deviation of 2.78%.[28] But this similarity of bills was purely superficial since in drawing the district lines, the internal composition by counties was markedly different, and the House refused to concur in the Senate amendments.[29] This set the stage for the appointment of conference committees.

After several conferences, the Conference Committee, by its very nature an instrument of compromise, agreed to a bill. On submission to the House and Senate under traditional legislative rules,[30] the sole question was whether to accept or reject in toto the Conference Report.[31] No amendments were permitted or offered. After some debate—especially in the Senate where Senator Spears, an intervenor-plaintiff, was critical of the Bill but careful not to allow his opposition to expand into a filibuster in breach of his assurances to those who acquiesced in his plan for drawing the lines for the district (Dist. 20) comprising San Antonio-Bexar County—the Bill passed both Houses on May 29.[32]

But legislative action was not yet quite over. For under the device of a concurrent resolution,[33] a device normally employed in the correction of legislative formal errors, very substantial changes were thereafter made.[34] It was H.B. 67,

28. For analysis of this plan, see Appendix C.

29. Tex.H.R.Jour., May 27, 1965, at 3112.

30. At the request of the Court, the State officials have filed authenticated extracts of the appropriate rules of the Texas Legislature which are now incorporated in this record.

31. Tex. House of Representatives, Rule 23, § 10.

32. Tex.H.R.Jour., May 29, 1965, at 3438; Tex.S.Jour., May 29, 1965, at 2167.

33. This gives rise to a non-federal, non-constitutional attack which we dispose of in our later discussion of The Enrolled Bill Problem.

34. H.C.R. No. 196, passed on May 31, 1965, the last day of the session. Tex. H.R. Jour., May 31, 1965, at 3469; Tex.S. Jour., May 31, 1965, at 2226. The Plaintiffs point out that H.C.R. No. 196 switched around nine different counties, containing an aggregate population of 179,710 Texans, among 4 different congressional districts, each already overpopulated with an aggregate population (before H.C.R. No. 196) of 1,822,998 people. Although some legislators gave as the reason for these inter-district county switches the overriding aim of population equality, the sheer statistics demonstrate that, whatever the aim, this could not have been it:

Comparison of Population of Districts Before and After H.C.R. 196 *

| | 10th District | | |
|---|---|---|---|
| Before H.C.R. 196 | | | 454,510 |
| –Lavaca | | –20,174 | |
| –Comal | | –19,844 | |
| +Wharton | | +38,152 | |
| +Blanco | | + 3,657 | |
| Net Change | | | +1,791 |
| After H.C.R. 196 | | | 456,301 |
| | 14th District | | |
| Before H.C.R. 196 | | | 457,282 |
| –DeWitt | | –20,683 | |
| –Wharton | | –38,152 | |
| +Goliad | | + 5,429 | |
| +San Patricio | | +45,021 | |
| +Live Oak | | + 7,845 | |
| Net Change | | | –540 |
| After H.C.R. 196 | | | 456,742 |

as corrected by H.C.R.No.196, which emerges.[35] Under this Act, as we earlier stated, the deviation was 9.7% over and 9.7% under the Ideal for an aggregate of 19.4%.[36]

## THE PRESENT PROCEEDINGS

Prior to the deadline for legislative compliance of August 1, 1965, fixed by our April 1964 Order (see note 17, supra), a number of interventions were allowed and filed attacking the validity of H.B. 67. The original Plaintiffs, largely from Houston (Harris County), now assumed a passive role for the very natural reason that Harris County had received three congressmen with no indicated objection to the manner in which internal district lines were drawn. But the new intervenor Plaintiffs were less satisfied, indeed, quite dissatisfied. These included named individuals as representatives of a class of voters in Dallas, Fort Worth, San Antonio, and elsewhere complaining largely of discrimination by rural interests against cities and of gerrymandering to dilute the political strength of Republican voters in some of the metropolitan counties. There were others with more localized objections.[37]

As it was likely that much factual information had to be brought to the Court's attention and that the case would have to be heard at an early date to permit decision to be effective for the impending 1966 elections, the Court scheduled a pretrial conference which took the better part of July 28, 1965. In essence the Court established a procedure for the ready exchange, authentication, and, if possible, stipulation as to the numerous exhibits contemplated and fixed a schedule for the tak-

| | 23rd District | |
| --- | --- | --- |
| Before H.C.R. 196 | | 455,155 |
| –San Patricio | –45,021 | |
| –Live Oak | – 7,845 | |
| –Goliad | – 5,429 | |
| +Medina | +18,904 | |
| +Lavaca | +20,174 | |
| +DeWitt | +20,683 | |
| Net Change | | +1,466 |
| After H.C.R. 196 | | 456,621 |
| | 21st District | |
| Before H.C.R. 196 | | 456,051 |
| –Medina | –18,904 | |
| –Blanco | – 3,657 | |
| +Comal | +19,844 | |
| Net Change | | –2,717 |
| After H.C.R. 196 | | 453,334 |

(+) Indicates a county added to district by H.C.R. 196
(–) Indicates a county removed.
Although the switch produced no net population change, it left all 4 districts overpopulated by more than 36,000 each, 2 by more than 40,000, for an aggregate overage of 155,866 people.

————◆————

35. The Act was signed by the Governor on June 9, 1965.

36. See analysis, note 4, supra.

37. This included intervenor Neil Caldwell, a State Representative from Brazoria County, who complained of discriminatory and unnecessary splitting of his county between Districts 9 and 14. State Senator Franklin Spears, from San Antonio, intervened to support his own plan (with deviations of 1.38% above and 1.93% below). Another legislator, Paul Haring, intervened complaining largely of discrimination in favor of the Northeast part of the State against the Gulf Coast-Southwest area.

ing of all testimony by out-of-court deposition by each of the respective parties, reserving to all the right to request, if desired, the court to hear all or a part of the testimony of particular witnesses in court on proper notice. This process, bearing out the confident expectation of the Court considering the caliber of counsel involved, resulted in the making of a full record on detailed oral depositions and exhibits with no party requesting the production of witnesses for court examination. This testimony, coming largely from members of the Legislature, some of whom were on the respective committees,[38] and others connected with the legislative process or observers of it,[39] afforded a substitute, inadequate to be sure, for a more formalized legislative history of the kind we come to expect from the Washington pattern. It rounds out the trial aspect to state that upon completion of the submission of this testimonial and documentary evidence,[40] the Court then heard extensive oral argument. It also fixed a schedule for the

38. Most of the members of the Legislature called by the Plaintiffs for deposition were called for discovery purposes as adverse witnesses.

39. The following depositions were filed in this case:

| | |
|---|---|
| Robert E. Johnson | Executive Director of the Texas Legislative Council. |
| Louis M. Crump | State Senator from San Saba, Texas; Chairman of the Congressional Redistricting Committee of the Senate; Chairman of the Senate Conferees on the Conference Committee H.B. 67. |
| G. F. Mutscher | Member of the House from Brenham, Texas; Chairman of the House Committee on Congressional Districting; Member of the Conference Committee. |
| Ralph Hall | Senator, 9th Senatorial District from Rockwall; Member Senate Committee on Congressional and Legislative Districting; Member Conference Committee Congressional Districting between the House and the Senate. |
| R. H. Cory | Member of the House of Representatives from Victoria, Texas, 33rd Legislative District; Member of the House Redistricting Committee. |
| George Parkhouse | State Senator from Dallas County; Member of the Senate Congressional Redistricting Committee. |
| Franklin Spears | State Senator, 26th Senatorial District Bexar County, Texas. |
| Martin Dies, Jr. | State Senator, 3rd Senatorial District; Member of the Senate Committee on Congressional and Legislative Districting and on the Subcommittee for congressional redistricting; Member from the Senate of the Congressional Redistricting Conference Committee. |
| Dr. Stanley Arbingast | Assistant Professor of Resources, University of Texas; Resources Specialist in the Texas Bureau of Business Research; Associate Director Texas Bureau of Business Research; Editor Texas Business Review; Joint Author with Dr. Kennamer of "Atlas of Texas." |
| Ronnie Dugger | Editor and Manager of the Texas Observer, an independent fortnightly journal, a political observer and writer. |
| Margaret Mayer | Reporter for the Dallas Times Herald, Austin Bureau. |

40. Only limited objections to relevance and materiality (reflected on the formal list of objections prepared by counsel at the Court's request), and none to formal authenticity, were made by the Defendants to portions of the testimony and to the exhibits. In view of the disposition we make, we overrule all such objections. We have received and considered all of the evidence, both testimonial and documentary.

filing of further briefs and replies, all of which have now been received and considered by the Court.

## APPLICABLE LEGAL PRINCIPLES

Before discussing the specific attacks made by the respective intervenor plaintiffs on the validity of H.B. 67, it is helpful to briefly set forth the controlling principles which, considering the brief span from Baker v. Carr, are not wanting either in quality or quantity.

Of course, the landmark case for congressional apportionment is Wesberry v. Sanders, 1964, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481. The standard is there stated in simple and emphatic terms:

> "We hold that, construed in its historical context, the command of Art. 1, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as practicable one man's vote in a congressional election is to be worth as much as another's,"

376 U.S. at 7–8, 84 S.Ct. at 530, 11 L.Ed. 2d at 486–87, since

> "[i]t would defeat the principle solemnly embodied in the Great Compromise—equal representation in the House for equal numbers of people—for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others,"

376 U.S. at 14, 84 S.Ct. at 533, 11 L.Ed. 2d at 490. Indeed, our prior opinion, Bush v. Martin, supra, 224 F.Supp. at 511, affirmed by the Supreme Court, expressed it prior to Wesberry in substantially the same terms:

> "The simple constitutional fact is that so far as (a) the standard of composition of the Congress is concerned, as distinguished perhaps from (b) the standard governing the time and circumstance permitting or requiring judicial intervention, Members of Congress are to be elected on the basis of population and nothing else."

And, in the great flood of legislative apportionment cases, the Supreme Court has made it clear that it meant what it said and means to adhere to what was said in Wesberry. Of course, the Court recognized that, in addition to drawing on different clauses of the Constitution (congressional apportionment on Article I and legislative on the Fourteenth Amendment),[41]

> "some distinctions may well be made between congressional and state legislative representation. Since, almost invariably, there is a significantly larger number of seats in state legislative bodies to be distributed within a State than congressional seats, it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting * * *."

Reynolds v. Sims, 1964, 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 536. And

> "[s]omewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting."

Id. at 578, 84 S.Ct. at 1390, 12 L.Ed.2d at 537. But the Court, hastening to add that it did not consider Wesberry "wholly inapposite," noted that

> "[n]evertheless, Wesberry clearly established that the fundamental principle of representative government in this country is one of equal representation for equal numbers of

41. "Gray [Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821] and Wesberry are of course not dispositive of or directly controlling on our decision in these cases involving state legislative apportionment controversies. Admittedly, those decisions, in which we held that, in statewide and in congressional elections, one person's vote must be counted equally with those of all other voters in a State, were based on different constitutional considerations and were addressed to rather distinct problems." Reynolds v. Sims, 1964, 377 U.S. 533, 560, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 526.

people, without regard to race, sex, economic status or place of residence within a State."

Id. at 560–561, 84 S.Ct. at 1381, 12 L.Ed. 2d at 526. The Court then held that even in the legislative cases, "an honest and good faith effort" must be made "to construct districts * * * as nearly of equal population as is practicable," 377 U.S. at 577, 84 S.Ct. at 1390, 12 L.Ed.2d at 536, and that consideration of relevant factors other than population would be constitutionally valid only "so long as the resulting apportionment was one based substantially on population." Id. at 578, 84 S.Ct. at 1390, 12 L.Ed.2d at 537.

Thus the term "as nearly as is practicable" in Wesberry seems to be the equivalent of the state apportionment aim of "substantial equality of population" in Reynolds, and since deviations from an ideal will be more, not less, difficult to justify for congressional districting, it certainly effectuates this general approach to infuse into the more rigorous congressional standards those negative prohibitions which the Court applies for state reapportionment. Hence for congressional as well as state purposes, "neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes." Id. at 579–580, 84 S.Ct. at 1391, 12 L.Ed.2d at 537–538.

But, of course, the Court had to state that

"it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement."

Id. at 577, 84 S.Ct. at 1390, 12 L.Ed.2d at 536. Because mathematical precision is neither required nor the test, we cannot find a mathematical escape from judicial travail:

"careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to *the character* as well as the degree *of deviations* from a strict constitutional basis." Id. at 581, 84 S.Ct. at 1392, 12 L.Ed.2d at 538–539. (Emphasis added.)

"In our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a *faithful adherence* to a plan of population-based representation, with such minor deviations only as may occur in recognizing *certain factors that are free from any taint of arbitrariness or discrimination.*" Roman v. Sincock, 1964, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620, 630. (Emphasis added.)

Thus, our task is twofold: we must ascertain, first, whether there has been a "faithful adherence" to the principle of equality and, second, whether deviations from this principle were the result of recognizing "certain factors that are free from any taint of arbitrariness or discrimination."

In ascertaining "faithful adherence," we are reminded that a State must "make an honest and good faith effort to construct districts * * * as nearly of equal population as is practicable," Reynolds v. Sims, supra, 377 U.S. at 577, 84 S.Ct. at 1390, 12 L.Ed.2d at 536, and that impossibility of mathematical precision "is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal," Wesberry v. Sanders, supra, 376 U.S. at 18, 84 S.Ct. at 535, 11 L.Ed.2d at 492. This,

we are told, "is the high standard of justice and common sense which the Founders set for us." Ibid.

■ And what are the "factors" that justify "minor deviations"? According to Reynolds, they are "[1] *legitimate* considerations [2] *incident* to the effectuation [3] of a *rational* state policy." 377 U.S. at 579, 84 S.Ct. at 1391, 12 L.Ed.2d at 537. And such "considerations" do not include: "[a] history alone, nor [b] economic or other sorts of group interests, * * * [nor] [c] considerations of area alone * * *."[42] They do include recognition of political subdivisions,

"[b]ut if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired."

Id. at 581, 84 S.Ct. at 1392, 12 L.Ed.2d at 539.

■ And, finally, while Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 certainly makes the problem now a justiciable one, the Court in laying down these imperative standards make clear that the job is essentially a legislative one. It emphasizes that

"reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so."

Id. at 586, 84 S.Ct. at 1394, 12 L.Ed.2d at 541.

This brings us to the constitutional objections leveled at H.B. 67.

## SHEER NUMERICAL DISPARITY

Of the three principal attacks—(1) sheer numerical disparity, (2) regional gerrymandering, and (3) political gerrymandering—the most formidable is the first.

■ Ordinarily in legal problems statistics are an indicative factor only. Here, of course, in this quest for population equality the result must always be measured, at least tentatively, in numbers. This, like some inquiries into other areas of discrimination, is therefore a situation in which statistics speak and when they do, courts listen.[43]

Although we conclude that for the time being H.B. 67 represents a good faith effort to achieve population equality, we would not minimize in the least the force of the arguments which the deviations from the Ideal graphically por-

---

**42.** Reynolds v. Sims, supra, at 579, 84 S.Ct. at 1391, 12 L.Ed.2d at 537–538:
"So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. * * * Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. * * * Arguments for allowing such deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing."

**43.** United States v. State of Alabama, 5 Cir., 1962, 304 F.2d 583, 586, aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112; United States ex rel. Seals v. Wiman, 5 Cir., 1962, 304 F.2d 53, 66–67, cert. denied, 1963, 372 U.S. 915, 924, 83 S.Ct. 717, 741, 9 L.Ed.2d 722, 729; United States v. Edwards, 5 Cir., 1964, 333 F. 2d 575, 579 at 581 (dissenting opinion); United States v. Mississippi, S.D.Miss., 1964, 229 F.Supp. 925, 974 at 993 (dissenting opinion), rev'd, 1965, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717; Williams v. Wallace, M.D.Ala., 1965, 240 F. Supp. 100, 108 n. 6.

tray. And no one may here argue with the statistics as such. We put special emphasis on this to make certain that in the inevitable (and healthy) review of this decision the issue of sheer numerical disparity will be posed squarely for the Supreme Court's approval or rejection. This is especially important because of the shortness of time and the likelihood that by stay, injunction pending appeal, or otherwise, some extraordinary action by the Supreme Court will be required to assure effective relief if our decision is incorrect.[44]

■■■■ The attack commences, of course, with the overall approach of the apportionment in which, out of 23 Districts, 15—over one-half of them—deviate from the Ideal by 5% or more, and of those 3 deviate between 8% and 9%, and another 6 by more than 9%. The maximum deviation over the Ideal is 9.7%, and the maximum deviation under the Ideal is 9.7%. This makes, of course, a 19.4% variation between the largest and smallest district. See note 4, supra. In terms of people rather than percentages, the picture is even more vivid. The largest district (Dist. 9) has 80,892 more people than the smallest district (Dist. 17), which means that the vote of each person in the smallest district is theoretically worth almost 20% more than the vote of each person in the largest district.[45] And again in terms of people, 15 districts have over 20,000 people more or less than they should have, and the average variance from the Ideal of all 23 districts approximates 23,000 people.[46] But it is obvious that in a district which is overpopulated it is not just the excess people who suffer: every person in such a district has his vote diluted. Thus it is significant that 5 million Texans are under-represented by virtue of their resi-

44. The machinery for the 1966 Congressional election begins operating in February 1966. Candidates must file applications for listing on the ballot not later than the first Monday in February. Tex.Elec.Code Ann. art. 13.12, V.A.T.S. (Supp.1964). The general primary is held the first Saturday in May, and the second primary is held the first Saturday in June. Tex.Elec.Code Ann. art. 13.03 (Supp.1964). The general election is held the first Tuesday after the first Monday in November. Tex.Elec.Code Ann. art. 2.01 (Supp.1964).

45. The ratio of the population, and hence of the weight of the vote, of the largest district to that of the smallest district is 1.22 to 1. What this means is that the voters in the smallest district are theoretically able to elect ⅕ of a Congressman more than the voters in the largest district.

The defendants, however, make an unusual analysis which emphasizes the danger of speaking in terms of averages. They begin with the fact that there is an aggregate population overage of 252,-450 in the seven largest districts, that this overage in population (subtracting some 30,000 persons living on military bases in Bexar County) "would permit these seven districts collectively to receive the equivalent of 53% of an additional Congressman, that under a perfect apportionment these seven districts would be entitled to elect 7½ Congressmen, and that the average deprivation in terms of individual voting rights is that each voter in each of the districts is deprived of sharing in the election of 1/14 of a Congressman. We doubt that there is much significance to this analysis. First, where the test is one-man-one-vote, or perhaps one-man-one-*whole*-vote, the comparison is between a given under-represented district (over the Ideal) and the smallest, most over-represented district (under the Ideal). In this sense a voter in an Ideal district suffers a dilution. Next, averaging of districts together hardly helps. Though averages may be significant in determining whether the Legislature has made a good faith effort toward the goal of constitutional apportionment, see text accompanying note 88, infra, they do not eliminate disparity as between individual voters in over and under districts. See note 8, supra.

46. See table in note 4, supra:

| | | |
|---|---|---|
| Col. (c) | Over | 265,428 * |
| Col. (d) | Under | 265,435 * |

$$530,863 \div 23 = 23,000$$

* These figures should be the same. We have not, however, attempted to discover the source of this error.

dence in overpopulated districts.[47] And 3 million of these live in districts which are more than 5% over the Ideal.

But countering these overall figures, which partake essentially of averages, Defendants urge several things. Foremost is that there is a substantial indication of basic fairness in this plan when the State as a whole is considered. For the minimum percentage of population represented by a majority of the Texas congressional delegation is 49.41%. Next, and perhaps most important, the population-variance ratio is 1.22 to 1.

## REGIONAL GERRYMANDERING

But the Plaintiffs do not stop with this general overall view. The basis of their assault is most vividly reflected in specific, more minute examples of the particular. These are presented under the catching subtitles: "Northeast Texas Wins Again," "The Cities Lose Out."

### A. Northeast Texas Wins Again

This argument starts with the situation existing under former Art. 197a declared by us to be unconstitutional. Bush v. Martin, supra. Under that Act, deviations ran from 128% over for former District 5 (Dallas County) to 49% under for former District 4 which was, and is, in the northeast corner of the State.[48] In fact, under Art. 197a the six districts composing what Plaintiffs denominate as the "northeast" (Dists. 1, 3, 4, 6, 7, 11) were all more than 23% under the Ideal.[49] To this is added further historical data which the Plaintiffs contend demonstrates that the population in the "northeast" area has diminished substantially in the past decade (1950-1960).[50]

Equally graphic and pertinent directly to the Plaintiff's claim "The Cities Lose Out", later discussed, is the decline in most of the Counties now comprising new District 6.[51]

This stands in sharp contrast to the effervescent, if not explosive, population gains in what the plaintiffs call "South

---

47. 

| Population of under-represented districts | 5,263,524 |
|---|---|
| Population of over-represented districts | 4,316,153 |
| Total population of Texas | 9,579,677 |

---

48. Bush v. Martin, supra, 224 F.Supp. at 506 n. 13. See note 10, supra.

49. For an analysis of deviations under Art. 197a, see TLC Congressional Redistricting 25.

---

50. Thus for the counties comprising new Dist. 1, the figures are:

| 1950 | 1960 | Total Decline |
|---|---|---|
| 430,764 | 378,334 | 52,430 |

51. With the exception of Brazos County and those counties (e. g., Johnson and Ellis) in the Standard Metropolitan Statistical Area of Dallas, the following counties of Dist. 6 lost population:

| County | Percent of Decline 1950–1960 |
|---|---|
| Hill | 24.4 |
| Navarro | 13.8 |
| Freestone | 20.2 |
| Leon | 17.0 |
| Madison | 15.6 |
| Grimes | 16.0 |

Texas and the Gulf Coast."[52] With this background the plaintiffs then group certain Districts to assert, first, the fact of regional disparity and, second, the argument that this was consciously done by the Legislature. Thus, in the 5 districts in the "Northeast" group (Dists. 1, 2, 4, 6 and 11), five congressmen are elected by 330,328 fewer persons than in the 5 counties of the "South Texas-Gulf Coast" group (Dists. 9, 10, 14, 21 and 23).[53] Elaborating on this same approach, the Plaintiffs point out that in the 6 largest districts (Dists. 9, 10, 14, 20, 21 and 23) which in the past decade increased in aggregate population by 23.1%, the excess over the Ideal for 6 districts is 230,345.[54] Worse than that, the Plaintiffs assert, the 6 largest contain 432,643 more people than live in the 6 smallest districts.[55]

But alarming as these figures first sound, we think that the Defendants are correct in asserting that under the existing circumstances this does not show either invidious population inequality or

52.

| District | County | 1960 Population | Percentage Gain Over 1950 |
|---|---|---|---|
| 9 | Jefferson | 245,659 | 29.9 |
| | Chambers | 10,379 | 31.9 |
| | Galveston | 140,364 | 29.1 |
| | Fort Bend | 40,527 | 30.5 |
| | Brazoria | 76,204* | 63.7 |
| 14 | Matagorda | 25,744 | 19.4 |
| | Jackson | 14,040 | 8.7 |
| | Victoria | 46,475 | 48.8 |
| | Calhoun | 16,592 | 79.9 |
| | Refugio | 10,975 | 8.5 |
| | Goliad | 5,429 | 12.7 |
| | Aransas | 7,006 | 64.8 |
| | San Patricio | 45,021 | 25.6 |
| | Nueces | 221,573 | 33.9 |

*Includes population for whole county including remnant in new Dist. 14.

53.

| Northeast Group | | South Texas-Gulf Coast Group | |
|---|---|---|---|
| District | Population | District | Population |
| 1 | 378,334 | 9 | 457,092 |
| 2 | 387,794 | 10 | 456,301 |
| 4 | 411,041 | 14 | 456,742 |
| 6 | 382,639 | 21 | 453,334 |
| 11 | 389,954 | 23 | 456,621 |
| | 1,949,762 | | 2,280,090 |

54. And Dists. 9 and 14, which are growing at even a faster pace than the average 23.1% (see note 52, supra), are already at the maximum of 9.7% over the Ideal. See note 4, supra.

55.

| Smallest Districts | | Largest Districts | |
|---|---|---|---|
| District | Population | District | Population |
| 1 | 378,334 | 9 | 457,092 |
| 2 | 387,794 | 10 | 456,301 |
| 6 | 382,639 | 14 | 456,742 |
| 11 | 389,954 | 20 | 449,303 |
| 13 | 381,829 | 21 | 453,334 |
| 17 | 376,200 | 23 | 456,621 |
| | 2,296,750 | | 2,729,393 |

designed regional discrimination. Thus, for example, to make out the regional struggle, the Plaintiffs include District 11 in the "Northeast." Geographically, this is a long way from the Northeast section and those residing in Parker and Hood Counties—west and southwest of Fort Worth—"Where the West Begins," —would be surprised to find themselves described as "Northeast Texans." Moreover, if grouping is to be done, there are more—or at least as—plausible selections. Thus Districts 6 and 11 are geographically and economically closer to District 10 than to District 1. Similarly, a grouping of Districts 1, 2, 4 with the Dallas Districts 3 and 5 would be more compact, contiguous and related than the Plaintiffs' "northeast" model (Dists. 1, 2, 4, 6, and 11).

And in the South Texas-Gulf Coast group, District 15 is obviously better than 21 which, to the north and west of San Antonio, is neither South Texas nor the Gulf Coast.[56] With these steps, the 330,328 disparity (see note 53, supra) would be cut to 239,974.[57] And, of course, for a natural grouping of Districts which are in fact in South Texas and the Gulf Coast, a grouping of Dists. 8, 9, 14, 15, and 22 is better than the Plaintiffs' model (Dists. 9, 10, 14, 21 and 23), and once this choice of the South Texas-Gulf Coast group (Dists. 8, 9, 14, 15, and 22) is compared with the preferable Northeast group (Dists. 1, 2, 3, 4, and 5), the so-called regional disparity dwindles to 152,927.[58]

We need not declare that the alternative groupings suggested by the Defendants are more, or less, plausible than those of the Plaintiffs. Rather, this analysis demonstrates the simple fact that groupings for congressional districting are really irrelevant. The injury sustained by a voter in an over district arises because, in contrast to a voter in some other specific district, his vote is diluted. His injury is not augmented by the fact that voters in adjacent or other related districts suffer a similar dilution in relation to the "test district"— i. e., the smallest one. Nor, on the other hand, is his injury lessened because voters in adjacent or economically contiguous districts enjoy near, if not perfect, numerical equality. The disparity, if it exists, is not going to be established by area. It comes down to disparity between voters in a particular district and the "test" district.

To make it crystal clear we hold, as a matter of fact, that no regional discrimination has been established. For reasons we later discuss at some length, we likewise hold, both in fact and law, that the uncontradicted statistical disparities nevertheless satisfy for the present the requirement of substantial numerical equality.

56. Of course it is understandable why Plaintiffs shy away from Dist. 15. It is near the Ideal (0.4% over) so it reduces sharply the disparity between the big, the little, the north and south Texas groups.

57.

| Alternative Northeast Group | | Alternative South Texas-Gulf Coast Group | |
|---|---|---|---|
| District | Population | District | Population |
| 1 | 378,334 | 9 | 457,092 |
| 2 | 387,794 | 10 | 456,301 |
| 3 | 410,622 | 14 | 456,742 |
| 4 | 411,041 | 15 | 418,183 |
| 5 | 417,174 | 23 | 456,621 |
| | 2,004,965 | | 2,244,939 |

58.

| | |
|---|---|
| South Texas-Gulf Coast (Dists. 8, 9, 14, 15, 22) | 2,157,892 |
| Northeast (Dists. 1, 2, 3, 4, 5) | 2,004,965 |
| | 152,927 |

### B. The Cities Lose Out

Akin to the charge of regional discrimination is the Plaintiffs' complaint that H.B. 67 is just another notch on the barrel in the running urban-rural battle.

We have great difficulty in following this contention since the metropolitan counties—with the possible exception of the districts taking up the San Antonio population—have been treated with almost mathematical equality. Dallas, the nation's most flagrant victim of malapportionment, Bush v. Martin, supra, at 506, ends up with two complete, almost Ideal, districts and the overage is divided between two adjacent districts (Dists. 6, 13), each of which is under the Ideal by 8%. Fort Worth (Tarrant County) has one complete district (Dist. 12) 5.3% over with its remnant in an "under" district (Dist. 6). Houston, getting a whole new congressman wholly within the county, hits the Ideal right on the nose. Only San Antonio sustains a marked numerical overage both as to the single district wholly within the county (Dist. 20) and as to the remnants in two adjacent districts (Dists. 21 and 23).[59]

So far as we can grasp it, we understand that, apart from the claim of partisan gerrymandering later discussed, the Plaintiffs are here asserting three things specifically. The first is essentially that the city vote was diluted by a fragmentation into several districts rather than into a single "remnant" district. The second contention is that in distributing the remnant the Legislature must have been motivated by some ulterior purpose since the district lines as thus drawn ignored completely the economic, sociological, and political associations of the city voter and his area, especially as represented by the Standard Metropolitan Statistical Area.[60] Thus for Dallas with two full congressmen, the Plaintiffs complain that the remnant of 123,731 [61] was split between two districts (6 and 13).

Paralleling this, they assert, is the treatment of the remnant of 99,917 in Fort Worth. Taking into account the rural nature of nearly all of District 6 and the marked decline in population of all but one of the counties south of the Dallas-Fort Worth SMSA (see note 51, supra), Plaintiffs urge that a much fairer, more compact, contiguous, geographically and otherwise, grouping could readily have been achieved, and the absence of it proves again impermissible motivation. Thus Plaintiffs suggest that instead of the sprawling mixture of city dwellers and country folk running

59.

| | Total City Population 1960 | Whole Districts | | | Remnants | | |
|---|---|---|---|---|---|---|---|
| | | No. | Population | Deviation | No. | Population * | Deviation |
| Dallas | 951,527 | 3 | 410,622 | −1.4% | | | |
| | | 5 | 417,174 | +0.2 | | | |
| | | | | | 6 | 59,705 | −8.1% |
| | | | | | 13 | 64,026 | −8.3 |
| Ft. Worth | 538,495 | 12 | 438,578 | +5.3 | | | |
| | | | | | 6 | 99,917 | −8.1 |
| San Antonio | 687,151 | 20 | 449,303 | +7.9 | | | |
| | | | | | 21 | 125,931 | +8.8 |
| | | | | | 23 | 111,917 | +9.6 |
| Houston | 1,243,158 | 7 | 417,283 | +0.2 | | | |
| | | 8 | 408,479 | −1.9 | | | |
| | | 22 | 417,396 | +0.2 | | | |

\* Population of remnant, not of entire district.

---

60. Referred to as SMSA. For definition of SMSA, see Bureau of the Census, U.S.Dept. of Commerce, County and City Data Book at xi (1962).

61. See note 59, supra.

south 175 miles almost to the north edge of Houston and in the opposite westerly direction 200 miles to the remote, sparsely populated county of Kent, four districts averaging an almost Ideal 414,204 persons could have been constructed within the Dallas-Fort Worth SMSA.[62]

A similar charge is made as to the distribution of the remnant of 236,848 [63] in San Antonio. While splitting the county into three, rather than two, districts is bad enough, it gets worse, so the argument runs, because the two remnant districts (21 and 23) are already overpopulated (plus 8.8% and plus 9.6%) and San Antonio voters find themselves literally mixed with others from Old to New Mexico.[64] Pursuing these statistics further, Plaintiffs also claim that the 189,957 city dwellers taken from San Antonio and Dallas [65] enabled West Texas, instead of getting just five congressmen which the population warranted, to keep the six congressmen it had received under the unconstitutional article 197a.[66] Here the Plaintiffs' contentions are more than arithmetical shuffling. They are an echo of a vigorous protest made by 24 members of the House and recorded as at least one thread of otherwise undisclosed legislative history.[67]

**62.**

### Dallas-Fort Worth SMSA

| Counties | Population |
|---|---|
| Dallas | 951,527 |
| Tarrant | 538,495 |
| Denton | 47,432 |
| Collin | 41,247 |
| Ellis | 43,395 |
| Johnson | 34,720 |
| | 1,656,816 |

**63.** See note 59, supra.

**64.** Ector County (Dist. 21) is but 15 miles from the New Mexico border and Webb County is on the Rio Grande, the International Boundary. Mileage again is prodigious with 288 miles to the northwest and 143 miles to the southwest of San Antonio.

**65.**

| From | District | Persons |
|---|---|---|
| San Antonio | 21 | 125,931 |
| Dallas | 13 | 64,026 |
| | | 189,957 |

**66.** Under Art. 197a, West Texas had 6 congressmen:

| Old District * | Population |
|---|---|
| 13 | 326,781 |
| 17 | 287,889 |
| 21 | 262,742 |
| 18 | 363,596 |
| 19 | 424,774 |
| 16 | 573,438 |
| | 2,239,220 |

* The numbers of the old districts roughly correspond to those of the new districts.

Using the Ideal for 23 districts, the population in these old districts would warrant only 5.38 congressmen. Yet under H.B. 67, West Texas receives 6 congressmen (new Dists. 13, 18, 19, 17, 21, 16). Eliminating the Dallas remnant from 13 and that of San Antonio from 21, the 6 new districts would support only 5.37 congressmen:

| New District | Population * |
|---|---|
| 13 | 317,803 |
| 17 | 376,200 |
| 18 | 394,582 |
| 19 | 425,517 |
| 16 | 394,679 |
| 21 | 327,403 |
| | 2,236,184 |

* Note: Remnants eliminated.

**67.** The 24 Representatives made this statement on personal privilege:

"The reasonable answer in West Texas was to combine districts 13 and 17

But again, as with the claim of regional discrimination, we think that these disparities in numerical equality and the shifting of counties into, around, under and out of districts do not establish either the fact of discrimination against the cities or, equally important, a purpose to do so.

Several things work in the opposite direction. Foremost is the fact that except for Houston which miraculously permitted 3 districts wholly within the county, every other metropolitan area inescapably presented the prospect of splitting counties. Which way to go? Confine the remnant to one district? Or split it? These, and many more, were questions facing the Legislature. And if SMSA has any relevance or may in the light of Wesberry v. Sanders, supra, be of any significance whatsoever, Dr. Arbingast (see note 39, supra) readily acknowledged two things. First, he claimed to be a business analyst and disclaimed being a political scientist. Although he thought that in drawing lines a prime factor should be to keep the SMSA's together, he gave no reason other than that the SMSA is the "accepted definition of the community of interest that binds people together by economic and cultural ties." Next, and especially in a State of 254 Counties and 262,840 square miles of area, a "contiguous county" [68] of a given SMSA may have as much, if not more, relation to an adjacent county outside the SMSA as it does to the "central county." [69] More important, it is a mistake to assume that the voice of the city dweller is lost in the wilderness of the rural areas. Except for 21 and 23, the remnant districts are considerably under the Ideal,[70] and in nearly all remnant districts the city population represents a very substantial percentage of the whole.[71]

and utilize their eastern counties for the enlargement of the adjoining districts. Instead of this, the Legislature in H.B. 67 maintained all the West Texas districts intact with variation of bounds and lines, at the expense of Dallas and San Antonio, neither of which are in West Texas.

"Here is how the districts were enlarged:

"18 took Bailey and Lamb Counties from 19 which in turn swapped out for Midland with 16.

"17 took 12 counties from adjoining districts, mostly from 13 and 21, which districts were already much underpopulated.

"Then 21 took 125,931 from Bexar County and 13 took 64,026 from Dallas County.

"Thus, instead of West Texas giving up one congressman, they kept their 6 congressmen, and took a population equivalent from the two big cities of

Dallas and San Antonio to make up their population deficiency."
Tex.H.R.Jour., May 31, 1965, at 3475.

68. SMSA's are composed of "central" and "contiguous" counties, the former being the county in which the "central city" is located. See note 60, supra.

69. For instance, complaint is made that the "contiguous counties" of Denton, Collin, and Ellis are split off from the Dallas SMSA of which they are a part into three diverse, predominantly rural districts (Dists. 13, 4, 6). Yet it seems clear that Collin County has as much relation to Grayson County with which it is put as it does to Dallas County; similarly, Ellis has as much in common with Navarro and Hill as it does with Dallas. In another area, the same is true as to Wilson and Atacosa Counties (Dist. 21) in relation to San Antonio.

70. See Dists. 6 and 13 under by 8.1% and 8.3 respectively so that proportionately the city dwellers' vote carries more weight than it otherwise might.

71.

| District | Total Population | Remnant Population | Remnant % of Total |
|---|---|---|---|
| 6 | 382,639 | 159,622 (a) | 42% |
| 13 | 381,829 | 64,026 (b) | 16% |
| 21 | 453,334 | 125,931 (c) | 27% |
| 23 | 456,621 | 111,917 (d) | 24% |

(a) This is the total of the Dallas and Fort Worth remnants since the Legislature could assume that in the urban-rural battle, despite reputed cleavages between the two cities, they would stick together.

The result is that we hold expressly both as a matter of fact and as of law that the Plaintiffs have not established this anti-city charge.

### COULD IT HAVE BEEN DONE BETTER? BY WHOM?

Although we reject as unfounded the attacks of regional gerrymandering, anti-Gulf Coast and anti-city discrimination, this record presents—and the Plaintiffs urge it with skill and fervor—a real question whether H.B. 67 achieves the goal of numerical equality "as nearly as is practicable." Wesberry v. Sanders, 1964, 376 U.S. 1, 8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481, 486. Included specifically in this broad assessment is the problem of whether a 9.7%, plus or minus, tolerance for an aggregate of 19.4% is excessive and whether lower percentage deviations among the in-between-districts are reasonable.

This takes us to the very heart of the matter and to the nature of the function and responsibility of the legislature and the judiciary. For it must be acknowledged that a "better," that is, more numerically perfect, apportionment can be made. This is demonstrated in a number of ways. Foremost in these proofs is the legislative process which dealt with several specific plans formally offered by members of the Legislature. These were all of a very "low" tolerance, some within 2% of the Ideal (see note 24, supra). And indeed, the respective House and Senate Bills (see Appendix B and C) were nearer on target. Moreover, this was acknowledged by Mr. Johnson,[72] Executive Director of TLC—a person of undoubted competence in the Texas problem of reapportionment, state and congressional. And for man or computer [73] (or both), with 254 counties and nearly 10 million persons to play with and contingent complications limited to locating and distributing the remnant excess in metropolitan areas, it remains

(b) This is the other remnant of Dallas County. In assaying the effectiveness of this remnant's power in the urban-rural struggle, it should be noted that the Wichita Falls SMSA is also in Dist. 13.

(c) This is one San Antonio remnant and it should likewise be noted that the Odessa SMSA is in this district.

(d) The other San Antonio remnant with the Laredo SMSA in the same district.

———◆———

72. To the question "Wouldn't it be a fair statement to say that any person with a reasonable amount of education could sit down and maybe one or two days and draw a better bill, one that would be more equal in population and more compact?" he answered, "In all probability, yes, sir."

73. The predictions, Brown, Electronic Brains and the Legal Mind: Computing the Data Computer's Collision With Law, 71 Yale L.J. 239 (1961), are perhaps bearing fruit. In Butterworth v. Dempsey, D.Conn., 1965, 237 F.Supp. 302, 313, the Court, prescribing precise standards appointed Morris S. Davis, Director of the Yale University Computer Center as Special Master and authorized the use of computer technology in reapportioning Connecticut. And on October 22–23, 1965, under the combined auspices of ALI and ABA, there was a seminar on Computers In Redistricting, the faculty of which included political scientists, information analysts and retrieval specialists, attorneys and law professors. See generally Clem, Measuring Legislative Malapportionment: In Search of a Better Yardstick, 7 Midwest J. of Pol. Sci. 129 (1963); Dixon, Reapportionment Perspectives: What Is Fair Representation?, 51 A.B.A.J. 319 (1965); Dixon, Reapportionment in the Supreme Court and Congress, 63 Mich.L.Rev. 209 (1964); Forrest, Electronic Reapportionment Mapping, Data Processing Magazine, July, 1965; Forrest, Apportionment by Computer, 7 American Behavioral Scientist 23 (1964); Forrest, Computerized Reapportionment Mapping of the State of New Jersey, The Joint Committee on Continuing Legal Education of the ALI and ABA, Oct. 22, 1965; Nagel, Simplified Bipartisan Computer Redistricting, 17 Stan.L.Rev. 863 (1965); Department of Political Science, The Ohio State University, Representation and Reapportionment (Political Studies No. 2, 1965); Schubert & Press, Measuring Malapportionment, 58 Am.Pol.Sci. Rev. 302 (1964); Weaver & Hess, A Procedure for Nonpartisan Districting: Development of Computer Techniques, 73 Yale L.J. 288 (1963).

naught but a somewhat tedious mechanical problem of shifting counties around to form almost perfect, numerically equal districts.[74]

74. See, for example, the Spears-Kennard Plan, Tex.S.Jour., May 26, 1965, at 1951, with deviation of 1.38% over, 1.93% under, for a total of 3.31%. The Plaintiffs, by Exhibit 2 to their supplemental brief suggest another possible plan with maximum variation of 0.9%. Unlike H.B. 67 which shifts 82 counties plus parts of 3 metropolitan counties from congressional districts in which they were situated under Art. 197a, the Plaintiffs' "hypothetical congressional districting plan" shifts only 68 counties plus parts of 3 metropolitan counties.

The process is illustrated by possible, but slight, reconstruction of district lines in districts which are Under and Over. For example, this table illustrates the manner in which counties may be shifted to minimize the deviations from the Ideal:

| DISTRICT | POPULATION UNDER H.B. 67 | DEVIATION UNDER H.B. 67 | ALTERNATE PLANS | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | SHIFT | POPULATION | FROM DISTRICT | TO DISTRICT | ADJUSTED POPULATION | ADJUSTED DEVIATION |
| 1 | 378,434 | −38,174 | Hunt | 39,399 | 4 | 1 | 417,833 | +1,325 |
| 1 | 378,434 | −38,174 | Upshur / Fannin | 19,793 / 23,880 | 4 | 1 | 422,107 | +5,599 |
| 6 | 382,639 | −33,869 | Limestone / Robertson | 20,413 / 16,157 | 11 | 6 | 419,209 | +2,701 |
| 6 | 382,639 | −33,869 | Parker / Hood / Somervell | 22,880 / 5,443 / 2,577 | 11 | 6 | 413,539 | −2,969 |
| 11 | 389,954 | −26,554 | Williamson / Robertson | 35,044 / 16,157 | 10 / 11 | 11 / 6 | 408,841 | −7,667 |
| 16 | 394,679 | −21,829 | Val Verde | 24,461 | 21 | 16 | 419,140 | +2,632 |
| 18 | 394,582 | −21,926 | Hale / Floyd | 36,798 / 12,369 | 19 | 18 | 412,763 | −3,745 |
| | | | Bailey / Lamb | 9,090 / 21,896 | 18 | 19 | | |

Note 74 Continued on next page

Note 74—Continued

| DISTRICT | POPULATION UNDER H.B. 67 | DEVIATION UNDER H.B. 67 | SHIFT | ALTERNATE PLANS | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | POPULATION | FROM DISTRICT | TO DISTRICT | ADJUSTED POPULATION | ADJUSTED DEVIATION |
| 17 | 376,200 | −40,308 | McCulloch<br>San Saba<br>Mason<br>Llano<br>Gillespie<br>Kendall | 8,815<br>6,381<br>3,780<br>5,240<br>10,048<br>5,884 | 21 | 17 | 416,353 | −155 |
| 9 | 457,092 | +40,584 | Fort Bend | 40,527 | 9 | 10 | 416,565 | +57 |
| 10 | 456,301 | +39,793 | Williamson | 35,044 | 10 | 11 | 421,257 | +4,749 |
| 10 | 456,301 | +39,793 | Blanco<br>Hays<br>Caldwell | 3,657<br>19,934<br>17,222 | 10<br>10 | 21<br>23 | 415,488 | −1,020 |
| 21 | 453,834 | +36,826 | Crockett<br>Schleicher<br>Sutton<br>Val Verde | 4,209<br>2,791<br>3,738<br>24,461 | 21 | 16 | 418,135 | +1,627 |

But again we hold in fact and law that this mechanical capacity for near numerical perfection does not carry the day. In doing so, we reject the defendants' arguments resting on Sincok v. Roman, D.Del., 1964, 233 F.Supp. 615, following the Supreme Court's affirmance of the judgment holding the previous apportionment to be invalid, 1964, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620. That Court declined to analyze the relative merits of proposed competing plans because "It is not our duty to determine whether a plan can be worked out that is superior in apportionment to that set up by * * [the bill under attack]. Our duty is to determine whether the plan set up by the General Assembly conforms to the requirements of the Constitution of the United States." 233 F.Supp. at 619. This approach is too doctrinaire. It is true, of course, that it is not for the Court to pick good, better, or best. But we think that in matching a standard which speaks in terms of substantial numerical equality or as numerically equal as practicable, the process inevitably calls for some sort of comparison.

■ But this is not helpful to the plaintiffs since the goal is not mathematical precision. What is required is not merely that numerical equality be achieved as nearly as practicable. Rather, it is that in this legislative function, the *Legislature* achieve numerical equality as nearly as is practicable. That means that until such time as the State Legislature indicates its complete unwillingness or inability to face up to the job, the apportionment, state and congressional, is for the Legislature, not the Courts. If—and the if is neither real nor big—it is a legislative function until default, then a proper regard for the separation of powers and the wide discretion necessarily reposed in each branch, must take into account that the

Legislature is to employ its traditional methods and processes. This means that for the Legislature to be effective, it must enact legislation.[75] The enactment of legislation is left to a legislative body which exists under the broad commands of the republican form of government Guaranty Clause of Art. 4, § 4, of the Constitution. See Baker v. Carr, 1962, 369 U.S. 186, 218–219, 82 S.Ct. 691, 711, 7 L.Ed.2d 663, 687. Its duty is, of course, to act under the law. And the product may finally be rejected by a reviewing court. But no court can command that legislators agree, or that a majority of them must agree, or that they must agree within specified limits.

■ Of course certain minimum standards may be laid down against which the resulting legislative product will be tested. To this extent legislative freedom or discretion is, of course, confined or constricted. But if it is to be legislative action, and courts are to supplant legislative action only after a demonstrated default, then courts must be careful in specifying standards lest what is legislative in name turns out to be in fact merely a court-contrived plan under a more palatable mantel of legislation.

Inevitably some adjustment, some give-and-take, some compromise must come about. What one House of a bicameral Legislature might pass may be wholly unacceptable to the other, and vice versa. The fact that each (see notes 25 and 27, supra, and Appendix B and C) may have separately passed a bill with almost identical maximum deviations is no assurance at all that there is any common meeting ground between the two—no common meeting ground except a consciousness that some law has to be passed and a suitable adjustment must be found.[76] It is easy to attain near nu-

75. In answer to the question whether he could draw a better bill, Mr. Johnson put his finger on the problem when he answered, "Yes, I imagine so, but I don't vote on them * * *."

76. In trying to ferret out the sources of disagreement between the House and the

Senate precipitating the appointment of the Conference Committee and the reporting out of a bill increasing the total deviation from 12% to 19.4%, Mr. Johnson gave these answers:

"Q. Well, I think you said that my assumption in the previous question re-

merical equality. It can be done in an infinite number of ways—starting in the metropolitan areas and working out, starting in one corner and working outward, starting in the middle and working to the perimeter. But every effort requires that lines be drawn and the moment three lines are drawn, it affects adjacent, then more remote, and finally the most remote areas. As the examples of reconstituted districts in note 74, supra, reveals, it is no wonder that these legislator-witnesses spoke of the process as a "game of dominoes."

▮▮▮▮▮ Thus the fact that districting within a 1% tolerance is attainable by a process other than legislative cannot be the final test as to what is reasonable and practicable for legislative action. Courts, faithful to the concept of separation of powers, must recognize therefore the operative effect of so-called "political" factors so long as they do not represent invidious attacks on, or denials of, identifiable basic freedoms such as race or religion.[77] So long as the result passes muster on substantial numerical equality, these might include here such things as the desire to minimize as much as possible the pairing of incumbent congressmen in the transition from the old (unconstitutional) to the new districting,[78] the retention of counties as whole units, the retention so far

as possible of former groupings of counties, and the like.

## THE STANDARD TO BE APPLIED

Of course both from the viewpoint of the legislator and a reviewing court, the problem is difficult since apportionment is (a) finally a question of numbers, yet (b) the Supreme Court has declined both in its general expressions and specific actions to equate constitutional demands with mathematical precision or, for that matter, to reflect maxima-minima percentage or ratio standards. Of course in Lucas v. Forty-Fourth General Assembly of State of Colorado, the Court expressed the view that apportionment of the Colorado House with a population variance ratio between the most populous and least populous districts of 1.7 to 1 and with 45.1% of the total population able to elect a majority of its members was "at least arguably apportioned substantially on a population basis," 1964, 377 U.S. 713, 730, 84 S.Ct. 1459, 1470, 12 L.Ed.2d 632, 643. But on the same day (June 15, 1964), noting that the District Court had indicated that population variance ratios smaller than 1.5 to 1 would presumably meet minimal constitutional requirements, the Court in affirming Sincock v. Roman, D.Del., 1963, 215 F.Supp. 169, declared that its affirmance "is not meant to indicate approval of the District Court's attempt to

moved most of the sources of disagreement among the legislators. Now, my assumption related to what I characterized as political considerations; therefore is it not true that the sources of disagreement among the legislators were basically political considerations?

"A. * * * I think I can say yes to that.

"Q. So the difficulty in achieving the best districting bill lay primarily in factors which related in some way to politics; is that correct?

"A. Yes, sir."

"Q. The difficulty did not lie in a mechanical problem of drawing the districts in such a way as to achieve equality of population and compactness primarily?

"A. Of course, there is some difficulty * * * in the mechanics of drawing a

district, but I think the primary considerations among the members were political."

77. Moore v. Moore, S.D.Ala., 246 F.Supp. 578, Oct. 4, 1965 (per curiam):

"Although constitutional rights and principles cannot be ignored or made subordinate to political expediency, courts recognize the fact that legislative bodies in a democracy do not, and cannot perform and function according to a slide rule, or with mathematical precision and certainty. Democracy does not operate in that fashion. There remains the necessity of giving consideration to all legitimate contentions, interests and other appropriate factors involved in the legislative process."

78. See paragraph 7 of the TLC recommendations, note 19, supra.

state in mathematical language the constitutionally permissible bounds of discretion in deviating from apportionment according to population." Roman v. Sincock, 1964, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620, 629–630.

▇▇▇ But despite these expressions, the fact remains that the goal of numerical equality deals with numbers and in the final analysis the end result is tested in numbers—e. g., this much deviation is too much, or this much deviation is permissible under these circumstances. And numbers means a comparison by percentage or ratio with the Ideal. Consequently, while we might be forbidden to lapse into arithmetical language in expressing approval or rejection, we certainly think that in testing whether a good faith effort was made by the Legislature, it is proper both to assay the mathematical standard set by the Legislature as its guide and to indicate for future action the outside maximum permissible deviation.

▇▇▇ In this process we have several firm convictions. Foremost is that we do not read the evidence as do the Plaintiffs. They insist that when legislative leaders declared the goal to be equality "within a 10% tolerance" or the like, the target was not "equality." Rather, it was "within 10% of equality." We reject this literalism. The Legislature was aware of several things. It had been fully informed on the constitutional demands of numerical equality.[79] It knew the numerical Ideal (416,508). It knew it could not possibly hit it exactly for 23 districts. It knew some tolerance was inevitable. It fixed—and adhered to—10% as the maximum deviation. We

agree and expressly declare that 10% (plus or minus) is the maximum deviation permitted for Texas. Equally important, we hold in fact and law that under the circumstances of this record, reliance on a 10% deviation standard does not prove or establish the absence of a good faith effort even though, as the illustrative alternatives reveal (see note 74, supra, and accompanying text), a 1 to 3% deviation is theoretically attainable.

Lest there be doubt, we recast this finding affirmatively to hold that the Legislature acted in good faith in relying on the 10% standard. A number of factors support this conclusion. One is that without approving or disapproving we took note in our previous opinion, 224 F.Supp. at 515 n. 30, that the New York Joint Legislative Committee on Reapportionment had adopted the recommendation of the special committee of the American Political Science Association[80] that in congressional apportionment the "deviation should not be permitted to exceed fifteen per cent"—a test which these eminent political scientists regarded as making a "fair allowance for the practical difficulties which state legislators must face." [81] And during this very session of the Legislature, a distinguished Court[82] having unique prestige for a State within the Fifth Circuit in Toombs v. Fortson, N.D.Ga., April 1, 1965, 241 F.Supp. 65, declared:

"[w]e decline to set a mathematical formula to be followed but we do hold that a variance of more than 15 percent would be difficult, if not impossible, to justify. It may be that there will be some later elucidation by the Supreme Court

---

79. See TLC Congressional Redistricting 15–22.

80. Committee on Reapportionment of Congress, American Political Science Association, The Reapportionment of Congress, 45 Am.Pol.Sci.Rev. 153 (1951).

81. Professor Hacker, Department of Government, Cornell University, in the report Congressional Districting: The Issue of Equal Representation (Brookings Institute, Revised September 1964 to

consider the effects of the intervening Supreme Court cases) states at page 79: "The points of demarcation to be used here are widely accepted. The American Political Science Association has defined an 'equitable' district as one within a 30 percent spread, ranging from 85% to 115% of the state norm."

82. Composed of Chief Judge Tuttle, Circuit Judge Bell, and District Judge Morgan.

on this complex question but until such event occurs, we will base any test as to the reasonableness as to variances on the departure figure of 15 percent." [83]

Likewise relevant is the action of the House of Representatives in passing H.R. 5505 increasing Congressman Cellers' proposed 10% (total 20%) tolerance [84] to 15% (total 30%).[85] So, too, is action in other states.[86]

 But in holding that a congressional reapportionment plan which contains some districts varying less than 10% (plus or minus) from the Ideal passes constitutional muster, we would make clear that we could not approve a plan under which *each* district varies 10% from the Ideal. Though we have previously indicated that the average deviation of districts from the Ideal (5.5%) and the minimum percentage of persons able to elect a majority of the Texas congressional delegation (49.41%) are figures of limited significance in testing a congressional plan against the principle of Wesberry,[87] these figures are certainly not irrelevant in determining

---

83. The Court also expressly referred to the proposal of the American Political Science Association, note 80, supra, and to the bill pending before Congress, note 85, infra. And more recently, in an opinion written by its highly respected Chief Judge Traynor, the Supreme Court of California has held:

> "Although the United States Supreme Court has eschewed establishing rigid mathematical standards for evaluating legislative apportionments * * *, we deem it only fair to the Legislature to set forth limits within which an apportionment would at least carry a strong presumption of validity * * * and beyond which it would be seriously suspect. Those limits are that no district depart from the ideal size by more than 15 per cent * * *. The * * * figure is that adopted by H. R. 5505 to govern congressional apportionment, which has been passed by the House of Representatives and is now pending in the United States Senate. * * * [citing Toombs v. Fortson,

supra]." Silver v. Brown (Adams v. Brown), Calif.Sup.Ct., Sept. 1, 1965, 46 Cal.Rptr. 308, 314, 315, 405 P.2d 132, 138, 139.

84. H.R. 970.

85. See U.S.Code Cong. & Ad. News No. 3, April 20, 1965, at viii, 89th Cong., 1st Sess. (30 U.S.L. Week 2482); H.R.Rep. No. 140, 89th Cong., 1st Sess. (1965).

It should be noted that both H.R. 5505 and the proposal of the American Political Science Association, note 80, supra, also require that congressional districts be compact and contiguous in territory, a requirement in force from 1911 (37 Stat. 13, 14) until it expired through failure of reenactment in 1929 (46 Stat. 21). With this requirement it may be that the greater maximum deviation of 15% can be tolerated. But in the absence of this requirement, which is for Congress and not this Court to impose, we hold that any deviation in excess of 10% (plus or minus) would be constitutionally unacceptable.

86. According to Defendants' brief, post-Wesberry v. Sanders congressional apportionment statutes with population deviations shown have not been attacked in the courts:

| State | Deviations from Ideal | |
|---|---|---|
| | Over | Under |
| Colorado | 12.6 | 7.4 |
| Connecticut | 14.1 | 4.3 |
| Georgia | 15.5 | 16.4 |
| Idaho | 9.4 | 9.4 |
| Indiana | 7.2 | 12.8 |
| Kansas | 8.4 | 9.6 |
| Maryland | 14.4 | 14.9 |
| Ohio | 13.2 | 18.1 |

---

87. See note 8, supra.

whether the Legislature has made a good faith effort to apply this principle. To make it absolutely clear that the maximum deviation of 10% should be the exception rather than the rule, we expressly hold that any congressional redistricting plan in which the districts on the average vary more than 5.5% from the Ideal and under which less than 49.4% of the people can elect a majority of the State's congressmen (12) would be condemned for failure to represent a good faith effort towards equality as nearly as is practicable.[88] We also affirmatively hold that H.B. 67 represents such an effort for the present.

We reject therefore the attack based on sheer numerical disparity.

## PARTISAN GERRYMANDERING

■ Despite the cautious disclaimer as to apportionments which operate, either designedly or otherwise, to minimize or cancel out the voting strength of racial or political elements in Fortson v. Dorsey, 1965, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401, and the affirmance of Wright v. Rockefeller, S.D. N.Y., 1962, 211 F.Supp. 460, in 1964, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512, on "clearly erroneous" principles,[89] the per

curiam action of the Supreme Court on October 11, 1965, in WMCA, Inc. v. Lomenzo, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2 affirming the judgment of the three-Judge District Court in WMCA, Inc. v. Lomenzo, S.D.N.Y., 1965, 238 F.Supp. 916,[90] now seems to make clear that partisan political gerrymandering is not within the prohibition of the Fourteenth Amendment.[91]

■ We could therefore readily reject this attack of the Plaintiffs as a pure matter of law. But as all must acknowledge that we are involved with a dynamic problem, we believe that to assure the Plaintiffs an effective review of our actions, we should make clear that we reject their contentions as a matter of fact as well.

The Plaintiffs' attack relates primarily to Dallas and the disposition of the remnant of 64,026 which went into District 13 to the west and northwest. A similar complaint, although much less documented in the evidence, is asserted as to the remnant of 125,931 in San Antonio which went into District 21. We accept factually the Plaintiffs' claim that this area of Dallas County for 11 years and 6 consecutive major elections has been a vigorous Republican stronghold of dem-

88. Neither H.R. 5505, note 85, supra, nor the American Political Science Association's proposal, note 80, supra, specify any maximum average deviation or minimum-to-elect-majority percentages. But since both proposals include the requirement that congressional districts be compact and contiguous, there is little danger that a plan can comply in which all districts deviate to the maximum from the Ideal.

89. In Wright a divided District Court found insufficient proof of political or racial gerrymandering, and the Supreme Court's affirmance on the basis of this finding seemed to indicate that if gerrymandering could be proved, it could be constitutionally challenged.

For an excellent discussion of these cases, see Note, The Apportionment Cases, 1965 Wis.L.Rev. 606, 632–650.

90. On the same day the Court summarily disposed of Travia v. Lomenzo, 1965, 382 U.S. 9, 86 S.Ct. 49, 15 L.Ed.2d 10, affirming S.D.N.Y., 246 F.Supp. 953,

July 13, 1965; Rockefeller v. Orans, 1965, 382 U.S. 10, 86 S.Ct. 75, 15 L.Ed. 2d 13, dismissing appeal from In re Orans, 15 N.Y.2d 339, 258 N.Y.S.2d 825, 206 N.E.2d 854; Screvane v. Lomenzo, 1965, 382 U.S. 11, 86 S.Ct. 90, 15 L.Ed. 2d 15, affirming S.D.N.Y., 238 F.Supp. 916.

91. See the concurring opinion of Mr. Justice Harlan:
"In WMCA, Inc. v. Lomenzo, D.C., 238 F.Supp. 916, the three-judge court found that Plan A satisfied this order; in so doing it rejected contentions that apportioning on a basis of citizen population violates the federal Constitution, and that partisan "gerrymandering' may be subject to federal constitutional attack under the Fourteenth Amendment. In affirming this decision, this Court necessarily affirms these two eminently correct principles."
382 U.S. at 5, 86 S.Ct. at 26, 15 L.Ed. 2d at 3 [34 U.S.L.Week at 3116].

onstrated outspoken, effective, militant, articulate conservatives. Likewise, we can accept the proposition that had this remnant gone into District 4 which encompasses a number of Dallas satellite communities in Collin and Rockwall Counties, it is quite likely that these remnant voters might have found more kindred, like-minded souls with consequent increase in political influence than among the rural people spreading out 205 miles to the west in District 13. We can also go back to our discussion under "The Cities Lose Out" to find as a fact that six compact, contiguous counties could have been grouped to make up four equal districts each bearing a strong metropolitan imprint,[92] and that in any such alignment the dilution of urban-Republican political influence would be less than it will be with the remnant attached to the west (District 13) or that it would have been with it attached to the northeast (District 4). We could find also that the opposition presumably stemming from people in Collin County (Dist. 4) effectually forced the remnant into 13.

But this does not add up to a conclusion that this group of voters were being pushed around by the Legislature as a whole in a way to dilute their collective political influence or to augment that of opposing groups. That remnant and, likewise the remnant (59,705) going into District 6 had to be put somewhere and shuffling the two remnants separately or together was bound to affect the complexion of any area to which either or both was affixed. But this is a long way from a purposeful shifting to accomplish such ends. We hold expressly that neither in purpose nor effect was the handling of the total Dallas remnant or any part of it partisan political gerrymandering.

Our holding is the same as to the disposition of the San Antonio remnant that the splitting of Ector (which includes the City of Odessa) and Midland (which includes the City of Midland) between 19 and 21, and the wresting of Orange County (in Dist. 2) from its longtime historical association with Jefferson (now in Dist. 9).

One intervenor attacked with much fervor the fact that H.B. 67 cuts Brazoria County for the first time in its long history.[93] The complaints, which are certainly real enough from the standpoint of community interests—the sociological, economic and political concerns—are hardly of a constitutional stature.[94] Once it was determined to split Orange and Jefferson Counties from their long togetherness, confining new District 9 to Jefferson, Chambers and Galveston Counties would have produced another "under" District subject to the same attack made here as to others (e. g., Dists. 1, 6, 13).[95] Adding all of Brazoria (76,204) would have produced a district (462,227) considerably larger than those now attacked (e. g., Dists. 10, 14, 23). Drawing the lines was obviously a legislative function and splitting Brazoria County was quite permissible. Indeed,

92. See note 62, supra, and accompanying text.

93. Brazoria County split into:

| | |
|---|---|
| District 9 | 20,163 |
| District 14 | 56,041 |
| | 76,204 |

94. The complaints are not of political gerrymandering but of population manipulation to achieve equality in disregard of political subdivisions. The intervenor argues that since Brazoria was split, others could have been practicably split to come closer to the numerical Ideal.

This is not so much an attack on what was done to Brazoria as an indirect attack on the overall plan. We reject this as we did the direct attack. While Reynolds v. Sims, supra, held that the Legislature *may* consider political subdivisions in drawing districts, we do not accept intervenor's contention that they must be considered.

95.

| | |
|---|---|
| Jefferson | 245,659 |
| Chambers | 10,379 |
| Galveston | 140,364 |
| | 396,402 |

the vice, if any, was in then adding all of Fort Bend (40,527) to run the total up to 457,092 (see note 74, supra).

THE ENROLLED BILL PROBLEM

At least one intervenor attacks H.B. 67 because it was in fact amended substantially through H.C.R.No.196 in contravention of the constitution and laws of Texas. Again, to make ourselves quite clear, we would be compelled to hold that there were in fact substantial changes in substance effected through this legislative device.[96] These were not mere clerical corrections or changes. We would also conclude that as no substantial, net gains toward population equality were achieved,[97] such purpose professed by several of the legislator-witnesses must be disregarded.

[redacted] Nevertheless, this avails the plaintiffs nothing. Though there may well be in this fluid field of ever-developing law situations in which the manner of enactment of state legislation itself might be a significant factor in assaying compliance with federal constitutional demands of substantial numerical equality, this is certainly not such a situation. For it brings into play the well accepted principle of Texas law, as to which there is no need whatever for abstention,[98] which Texas characterizes as the enrolled bill rule.

> "The rule has long been established in this state that a duly authenticated, approved, and enrolled statute imports absolute verity and is conclusive; that the act was passed in every respect as designated by the Constitution; and that resort may not be had to the proclamation of the Governor and to the journals of the two houses to invalidate the law."

Jackson v. Walker, 1932, 121 Tex. 303, 307, 49 S.W.2d 693, 694.[99]

WHAT OF THE FUTURE?

For reasons pointed out, we have held H.B. 67 represents for the present a good faith effort by the Legislature toward achieving substantial numerical equality. In this conclusion we have, however, emphasized the present. Against the past of the long existing discrimination of Art. 197a and with corrective legislation coming from an assembly which is itself unconstitutionally constituted, we think there are likewise many reasons why this approval should be tentative and for a *limited duration.*

Ordinarily, congressional reapportionment would coincide roughly with the decennial census. There is a manifest desire for stability which might easily be undermined by frequent reapportionments even though contemporary, explosive population increases and shifts would often justify reapportionment more often than once a decade.[100] This

96. See note 34, supra.

97. See note 34, supra, and accompanying text.

98. Compare City of Chicago v. Atchison, T. & S. F. R., 1958, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174, and Toomer v. Witsell, 1948, 334 U.S. 385, 392 n. 15, 68 S.Ct. 1156, 1160 n. 15, 92 L.Ed. 1460, 1469 n. 15, with Harrison v. NAACP, 1959, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152.

99. This is consistently followed in more recent cases: Ellison v. Texas Liquor Control Bd., Tex.Civ.App., 1941, 154 S.W.2d 322, writ ref'd; James v. Gulf Ins. Co., Tex.Civ.App., 1944, 179 S.W.2d 397, rev'd on other grounds, 1945, 143 Tex. 424, 185 S.W.2d 966; Falkner v. Memorial Gardens Ass'n, Tex.Civ.App., 1957, 298 S.W.2d 934, writ ref'd n.r.e.; Nueces County v. King, Tex.Civ.App., 1961, 350 S.W.2d 385, writ ref'd.

100. Reynolds v. Sims, supra, 377 U.S. at 583–584, 84 S.Ct. at 1393, 12 L.Ed.2d at 540:

> "Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long

has led the Defendants to urge that if H.B. 67 were held to be unconstitutional, we should allow the Legislature until the 1970 decennial census to make necessary changes. Now that we have recognized H.B. 67's validity for the present, we would assume that they would likewise suggest that we should leave well enough alone until after 1970. But we think there are a number of factors pulling in the opposite direction.

Foremost is that while we approve the plan, this rests largely on the ground that this is the Legislature's first effort toward meeting the constitutional imperative. That we do not find it deficient enough to set it aside and install one of our own is a long way from holding that it is free from shortcomings or that such shortcomings may somehow get frozen into the legislative thinking (or our own) as adequate criteria for the future. We have approved the 9.7% (plus or minus) deviation for the present and have categorically held for the future against a deviation greater than 10% (plus or minus) distributed among the districts substantially no less favorably than H.B. 67.[101] But the fact remains, as our discussion of sheer statistics reveals, that there is little, if any, justification shown for any prolonged continuation of many of these marked disparities. As ready examples are Districts 1 and 6 in the northeast, central east, and east. With a stable, if not declining, population (see notes 50, 51, supra), and with adjacent counties available for shifting to achieve the present Ideal (see note 74, supra), the Legisla-

ture may well find it increasingly difficult to justify a failure to remedy the readily remediable.[102]

There is, of course, a beguiling appeal to postpone the second look until after the 1970 decennial census. But pursuing our prior purpose always to temper our legal holdings by equitable factors (see text accompanying notes 16 and 17, supra), we think such delay would be unreasonable. To begin with, the census, physically taken in 1970, will not be sufficiently collated earlier than late spring of 1971. Assuming presidential and congressional action, 2 U.S.C.A. § 2a, in 1972, the Texas election machinery would already have been set in motion by February 1972 (see note 44, supra) for the election of congressmen in November 1972 for the term commencing January 1973. This would mean that effective review (and relief) would actually be postponed until the election of 1974 for terms commencing January 1975. Thus for the 5 remaining years of this and 5 more of the next decade, the 1965 redistricting with all of the deficiencies naturally inhering in a first effort of correction, would both effectively control the selection of Texas congressmen and, worse, deny any effective judicial review.

The prospect of nearly a decade without legislative reconsideration becomes increasingly unacceptable when it is recalled that H.B. 67—both good and weak as it is—was conceived and brought into being by a body which itself was unconstitutionally constituted.[103] For conse-

as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect."

101. See text accompanying note 88, supra.

102. So, too, for the reverse situation in, say, Dists. 9 and 14 where maximum overages (see note 4, supra) in areas of spectacular population expansion (see note 52, supra) make it certain that things are daily getting worse, not better.

103. Pending before this same Court is Kilgarlin v. Martin, S.D.Tex., C.A. No. 63–H–390, filed July 15, 1963. Following Reynolds v. Sims, supra, and related cases, this Court declared Texas' legis-

quences which will have such marked effect for such a long duration, Texas voters represented by these class plaintiffs ought to be entitled, as a minimum, to require that the new constitutionally constituted Legislature [104] perform its constitutional duty of prescribing the congressional apportionment. This is really but another application of the theme we have stressed throughout this decision: congressional apportionment is essentially a legislative function. Being legislative in nature, it is not asking too much that the new, valid, constitutional Legislature now take its hand, not against the discrimination of old 197a, but against the weaknesses and deficiencies of H.B. 67.

Thus, our approval is limited in duration. We retain jurisdiction to enable the 60th Legislature, convening in January of 1967 and any special sessions convened through July 1967, to take further action. We do not undertake now to blueprint the character of hearing to be offered, questions of burden of proof [105] or the nature of the relief, if any, to be granted depending on what the Legislature might or might not do. Nor do we pinpoint the areas of our concern, the weaknesses or possible deficiencies in the H.B 67 plan. The Texas Legislature and all of the executive officials are conscious of their constitutional duty which, no longer a mere negative prohibition, now affirmatively rests upon them. They will have ample guidance in 1967 for a close scrutiny and necessary revision of H.B. 67.[106] Indeed, this very litigation in its advocative hammering out of the issues, possible standards, strengths and deficiencies of H.B. 67, has made a substantial contribution to the continuing legislative process and function as the Texas Legislature takes the second and sharper look.[107]

Decree in accordance with opinion. (See Appendix D)

INGRAHAM, District Judge (concurring specially):

I concur in the result and expressly approve all of that portion of the court's

---

lative apportionment (Tex.Rev.Civ.Stat. Ann. arts. 193 and 195) unconstitutional and in effect gave the Texas Legislature until August 2, 1965, to enact valid legislation. In response the 59th Legislature reapportioned the Texas Senate and House of Representatives by S.B. 547 (Tex.Rev.Civ.Stat.Ann. art. 193a [Tex. Laws 1965, ch. 342, at 719]) and H.B. 195 (Tex.Rev.Civ.Stat.Ann. art. 195a [Tex.Laws 1965, ch. 351, at 753]), respectively. The constitutionality of the latter has been attacked and was the subject of a separate, extended, factual hearing and argument.

104. As note 103, supra, reveals, the validity of H.B. 195 is now before this Court. Our comments here are neither a forecast nor intimation of our decision. Whatever our decision, it is certain that either by reason of the plan prescribed by the Legislature, a plan prescribed by this Court, or a combination of both, the Legislature elected in 1966 to commence in 1967 will be markedly different—especially in any urban-rural conflict—from that which sired H.B. 67.

105. For an able discussion of problems of burden of proof in apportionment

cases, see Note, The Apportionment Cases, 1965, Wis.L.Rev. 606. In reaching our conclusions, we have not had to take a fixed position on burden of proof.

106. One of the principal handicaps under which the 59th Legislature labored—the absence of specific judicial guidelines (see TLC Congressional Redistricting)—may well be remedied by the time the 60th Legislature convenes through subsequent pronouncements of the Supreme Court in this case and others.

107. At least in correcting the more spectacular instances of over and under population, the Legislature is not necessarily confined to 1960 census figures which in many areas are now stale and inaccurate. The business world makes important decisions on the responsible estimates of respected demographers and if clearly revealed in the 1967 legislative history, there is no reason why the Texas Legislature may not do likewise. Such estimates are available in Texas from official or semi-official sources including the Texas Bureau of Business Research, see note 39, supra, an adjunct of the University of Texas, which has just released its predictions for 1970, 1980, 2000, and 2020 A.D.

opinion under the heading of "WHAT OF THE FUTURE?"

From the Supreme Court decisions, the only standard is equality of population. The duty to redistrict was upon the legislature. The variation of 9.7% may not be invidiously discriminatory, although better results could have been achieved.

I cannot reject, as the court's opinion does, plaintiffs' claim of regional gerrymandering but believe, as a matter of law, that it is immaterial.

The legislature had before it several plans (bills proposed by Representatives Richardson, Cahoon, Eckhardt, Sherman, Johnson and the Spears-Kennard Substitute), any of which would have been a better bill than the one enacted. H.B. 67 was the most discriminatory plan presented. The results achieved by it were no accident. Such results could be obtained only through great labor and willful conniving.

In Brother Noel's opinion to follow, he observes "The Legislature is left to do so without chart or compass or any standard by which to gauge its end product, except the population standard which heretofore has been constitutionally applied" and further on poses the question "How can this duty be correctly discharged unless this Court furnishes the additional constitutionally required standards which will teach the Legislature and executive officials what in H.B. 67 should be improved and, if so, how it should be improved?" But what chart, compass or guidelines do we need to achieve fundamental equity and fairness except fundamental equity and fairness. H.B. 67 does not give it to us.

I repeat that H.B. 67 was the most discriminatory plan presented and that any of the other plans presented would have been better. It not only had the greatest variance in population figures but also had the most glaring regional gerrymandering. As an example of what could have been done, we need only look to the Spears-Kennard Substitute to the bill. In it, no district varied in excess of 2% and only seven varied more than 1%. The district lines were fairly drawn and the districts compact. It did not place northern Dallas County in the same district with the far West Texas counties of Dickens and Kent, near Lubbock. It did not place the southern portions of Dallas and Tarrant Counties in a district running almost to Harris County. It did not place portions of Bexar County in a district running to within 15 miles of the New Mexico state border. It did not divide any county having a population of less than 416,508, the average figure.

Responsibility for redistricting rests with the legislature. Responsibility for the quality of the legislature rests with the people.

NOEL, District Judge (concurring in part and dissenting in part):

The Court holds that House Bill 67 is constitutional, and with this I agree. Most of that with which I disagree, respectfully, is capsuled in that section of the Opinion of the Court entitled, "What of the Future?" and in sub-paragraph *"Third"* of the Court's Decree. Essentially, my disagreement is with the Court's retaining jurisdiction over the Texas Legislature until August 1, 1967. Having held H.B. 67 constitutional, I deem it unseemly, unsuitable and inappropriate that this Court should continue to retain jurisdiction. The evidence is in, extensive oral and written arguments have been had, and the Bill has been held constitutional. With respect, I say that it is now time for this Court to surrender its overlordship and dismiss this case.

In "What of the Future?" the Opinion reminds the Texas Legislature and executive officials of their affirmative, constitutional duty to act, but it declines to pinpoint the area of the Court's concern as to "the weaknesses or possible deficiencies in the H.B. 67 plan" and it declines to give guidance for "a close scrutiny and necessary revision of H.B. 67"; but it does express satisfaction over the "substantial contribution to the continuing legislative process and function" brought about by this litigation. In

euphemistic prose the Opinion hails the Texas Legislature forward, onward and upward, to grapple with an amorphous problem. The Legislature is left to do so without chart or compass or any standard by which to gauge its end product, except the population standard which heretofore has been constitutionally applied.

Realistically read, this section of the Opinion says that while such "weaknesses and possible deficiencies" do not now condemn the Bill, they may possibly do so as of August 1, 1967, and therefore, pressure in the form of continuing jurisdiction should be applied in order to be sure that the suggested "close scrutiny and necessary revision" is accomplished. If H.B. 67 were unconstitutional, there would be some lawful reason in retaining jurisdiction of this case. But there can be no lawful reason for doing so after the Bill has been held to be constitutional.

As the Opinion recognizes, in the 1966 elections (which are now upon us) a new House of Representatives and a new Senate will be voted on by the people of the State of Texas. The results of this case as expressed in the Opinion will be fresh in the minds of the electorate and all candidates for the Texas House and Senate. Among other important issues, what should or should not be done by the Legislature about further congressional reapportionment should and undoubtedly will be thought about, discussed and debated both by the candidates and by the voters. In any event, the opportunity for them to do so should exist, unfettered and unpressured by the threat of further action by this Court in this particular case.

This case should not remain on the docket either as a stimulant or deterrent to the normal political processes, either of election to the Legislature or action by the Legislature. The views expressed in the Opinion are clearly stated. It must be presumed that these views will be read, weighed, debated and acted on by the people of Texas and their new Legislature as their lights best lead them. In this respect, it should faithfully be borne in mind by all concerned that under the Constitution as presently interpreted by the Supreme Court, as long as the requirements of substantial equality of population and no racial gerrymandering are met, it is the exclusive prerogative of the Legislature to determine the composition, shape, location and other characteristics of congressional districts. These latter legislative determinations involve purely political questions as contrasted with justiciable questions, and are not subject to judicial review.

The question of further congressional reapportionment will undoubtedly be considered by the 1967 Legislature, even if this case is dismissed. The composition of the 1967 Legislature will be radically different from the unconstitutionally constituted Legislature which passed H.B. 67. The comparative representation from the four great metropolitan areas of Texas will be as follows:

| | 1965 Legislature | | 1967 Legislature | |
|---|---|---|---|---|
| | House | Senate | House | Senate |
| Dallas | 9 | 1 | 14 | 3 |
| Ft. Worth | 7 | 1 | 8 | 2 |
| San Antonio | 7 | 1 | 10 | 2 |
| Houston | 12 | 1 | 19 | 4 |
| Total | 35 | 4 | 51 | 11 |

If the basic struggle over congressional reapportionment is between the urban and rural areas, as contended by plaintiffs, it goes without saying that with their vast new numerical power in the next Legislature and their alertness to the problem, the urban legislators from these four areas will work diligently to

cure any "weaknesses and possible deficiencies" which they find to exist in H.B. 67. They will have the benefit of the views expressed in the Opinion, the views of their constituents, and their own consciences to motivate them. They will not need any pending case on the docket of this Court to goad them into action.

And lest there be concern that this re-examination might not occur in the event both great political parties should not have a substantial number of their own membership in the 1967 Legislature, which could happen, it must be remembered that the position of plaintiffs here has been urged by members of both the great political parties. I believe it inevitable that, even though this case should be dismissed, this same position would be presented to the 1967 Legislature with seriousness and vigor.

When the 1967 Legislature has met, acted and adjourned, there will be a place and ample time for examination of its product by all interested parties and all other citizens of Texas. Should anyone be aggrieved with such product, this Court would be open for business and a new suit could be filed immediately. This Court could be expected to act promptly on any such complaint, as it has heretofore. The only possible loss in time or expense to the parties would be the cost of filing suit and effecting service, nominal at most. But in the meantime, this federal Court would have shown a proper respect for and faith in the Texas Legislature, and particularly the 1967 Legislature, the members of which are yet to be elected.

Turning now to the "constitutional duty" to improve H.B. 67 which the Opinion says "affirmatively rests upon * * * The Texas Legislature and all of the elective officials." How can this duty be correctly discharged unless this Court furnishes the additional constitutionally required standards which will teach the Legislature and executive officials what in H.B. 67 should be im-

proved and, if so, how it should be improved? In Reynolds the Supreme Court made it crystal clear that *population is the sole constitutional standard* for re-apportionment, *except* as it may be reasonably modified *but not submerged* in order to observe boundaries of political subdivisions.[1] If this Court wishes the Legislature to pass another bill by August 1967—its third congressional re-apportionment bill in a decade—the Court should delineate such additional constitutional standards, *if any there be or should be,* the satisfaction of which would assure the Legislature that its third bill would be immune from attack. Could such failure of the Court be due to the non-existence of such additional constitutional standards? With respect, I say such do not exist. The reason such additional standards do not exist is that the two constitutional standards which I have mentioned are the only judicially discoverable and manageable standards heretofore discovered. All other criteria to be considered by the Legislature are therefore political in quality and not justiciable. Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Coleman v. Miller, 307 U.S. 433, 454–455, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

In suggesting that such additional standards exist but in failing to identify them, the Opinion focuses attention on the dilemma precisely envisioned by Mr. Justice Harlan's dissenting opinion in Reynolds, 377 U.S. at pages 621 and 622, 84 S.Ct. at pages 1412 and 1413, 12 L.Ed. 2d 506, from which I quote:

"Generalities cannot obscure the cold truth that cases of this type are not amenable to the development of judicial standards. No set of standards can guide a court which has to decide how many legislative districts a State shall have, or what the shape of the districts shall be, or where to draw a particular district line. No judicially manageable standard can determine whether a State should have single-member dis-

---

1. There is, of course, the Constitutional prohibition against racial gerrymandering, which is not involved in this case.

tricts or multimember districts or some combination of both. No such standard can control the balance between keeping up with population shifts and having stable districts. In all these respects, the courts will be called upon to make particular decisions with respect to which a principle of equally populated districts will be of no assistance whatsoever. Quite obviously, there are limitless possibilities for districting consistent with such a principle. Nor can these problems be avoided by judicial reliance on legislative judgments so far as possible. Reshaping or combining one or two districts, or modifiying just a few district lines, is no less a matter of choosing among many possible solutions, with varying political consequences, than reapportionment broadside.[82]

"82. It is not mere fancy to suppose that in order to avoid problems of this sort, the Court may one day be tempted to hold that all state legislators must be elected in statewide elections."

The Opinion expresses concern that if the Legislature does not correct the weaknesses and possible deficiencies of H.B. 67 at the next session, such might not be done until after the next decennial census. Even if this should occur, the elapsed time would not be wanting in respectable precedent, for historically, under federal law the decennial reapportionment of the House of Representatives follows the decennial census, provision for which is found in 2 U.S.C.A. § 2a. Congress employs and follows the decennial census figures in reapportioning the Congress for the next ensuing decade, even though state populations may change radically during such period. Undoubtedly, the reasons for this are not only that the federal census is the sole universally accepted method now in existence for tabulating precise population figures, but that adjustments made decennially are reasonable and need not be made more frequently.

In Reynolds the Supreme Court recognizes *but does not* condemn the fact that

"* * * reapportioning no more frequently than every 10 years leads to some inbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators." 377 U.S. at 583, 84 S.Ct. at 1393. Indeed, the Court states: "Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth." Ibid.

Examining reapportionment statutes more frequently than every ten years would require interim population statistics. Any statistics used should be statewide and free from bias, but the Opinion admits in note 107 that such interim statistics would be mere estimates. Should the estimate come from the Texas Bureau of Business Research, from Chambers of Commerce, public utilities, cities, market research companies, the highway department, or some other source? The list of possible sources for "guesstimates" is limited only by the imagination of man.

In a case of claimed invidious discrimination, the burden of proving and determining population, and therefore population disparity, other than through the decennial census would be enormous for the parties as well as the Court. Each party would, of course, choose the statistics most favorable to his point of view. In an age of mobile population, estimates, even responsible estimates, frequently prove to be absolutely incorrect, and should not be the basis for legislative action. Undoubtedly, these are the reasons the Congress relies solely on the decennial census. I am of the view that any apportionment based upon population statistics other than the decennial census would be extremely unwise for either the Legislature or this Court.

The Opinion worries that H.B. 67 will govern the election of congressmen for ten years, but such worries seem to be founded upon two assumptions: (1) that the Legislature will not reapportion in 1973; or (2) that if the Legislature does reapportion in 1973, then at that

time H.B. 67 may be deficient. The second assumption is expressed in the phrase, "effective review (and relief) would be postponed until the election of 1974." The answer to these worries is that judicial review will be available in late 1973, early enough to correct any deficiencies prior to the 1974 congressional elections; and judicial review should conform as much as possible, to a schedule based primarily upon a decennial reapportionment scheme.

Again with respect, I say we should allow the Texas Legislature time to get into phase with the decennial census for congressional reapportionment purposes, and not require legislation and review every two years—such a process wastes legislative and judicial resources unnecessarily. This Court struck down the former congressional apportionment statute two years ago. Bush v. Martin, 224 F.Supp. 499 (S.D.Tex.1963). Two years later the Legislature passed House Bill 67, challenged in this proceeding. The Opinion now admonishes the Legislature that improvement on H.B. 67 must be effected by 1967 to retain the Court's "approval." With or without legislation, there will be another hearing in 1967. Although the Supreme Court in Reynolds says: " * * * [W]e do not regard the Equal Protection Clause as requiring * * * biennial reapportionment * * *," 377 U.S. 583, 84 S.Ct. 1393, this Court is in effect putting it on a biennial basis.

This Court cannot assume the Supreme Court will answer all of the open questions of law, such as burden of proof, by 1967. If the Court is to give an interim approval to H.B. 67 as indicated in the Opinion, it is under a duty to decide the basic issue of burden of proof which has been consciously avoided. Without having such conclusion of law before it, the Supreme Court cannot review this Court's determination of whether plaintiffs have the burden of proving H.B. 67 or its successor unconstitutional or whether defendants have the burden of proving it constitutional. If another

hearing is to be had in this case in 1967, it will be of great importance to all concerned that the Supreme Court shall have answered that question.

In conclusion of my disagreement with "What of the Future?," I will note that the Reporter System contains no case in which a federal court has stricken down any reapportionment statute, congressional or state legislative, in which the range of deviation is as low or as small as that of H.B. 67. Also, it reflects no case decided by any federal court in which the case has been held on the docket pending "improvement" by the legislature. This supports the action of the Court in holding H.B. 67 constitutional, but also, it strongly supports the suitability and appropriateness of a dismissal at this time.

In the beginning, I indicated my concurrence in the Opinion of the Court except as to the subject matter capsuled in the section entitled "What of the Future?" But in concurring, I shall briefly elaborate my views with respect to the claimed underrepresentation and overrepresentation as expressed in numbers of people, rather than in percentages[2] It is true that such percentages, when multiplied by the total population of Texas, reflect large numbers of people, as set forth in the Opinion. The percentages look small but the population figures sound large. Although interesting, this underrepresentation expressed in numbers of people is not dispositive and is somewhat misleading.

Actually, the numbers of people affected as such should be accorded little if any weight. Assume arguendo, that the fifteen districts which deviate from the Ideal by 5% or more, deviate not 5% but only to the extent of 3% or 2%, or even 1%. Under any such assumption, plaintiffs' contention that 5,263,524 Texans live in underrepresented districts would be equally true, numerically speaking. Therefore, in determining the constitutionality or unconstitutionality of a par-

2. See pp. 498–500 of the Opinion under sub-title "Sheer Numerical Disparity."

ticular apportionment, it is the degree of underrepresentation or deviation from the Ideal in a particular district, or the average deviation from the Ideal for all districts, which is significant. For the purpose of the Court's evaluation from a constitutional standpoint, dilution or disparity which results in invidious discrimination is a question of degree and must be expressed or measured in terms of percentage—not in terms of the numbers of people affected by such percentage.

Subject to this concurrence in part therewith and dissent in part therefrom, I have joined in the Opinion of the Court and the Decree of the Court.

## APPENDIX A

TEXAS CONGRESSIONAL DISTRICTS

H.B. 67 59th Legislature, Regular Session
EFFECTIVE FOR 1966 ELECTIONS

TEXAS LEGISLATIVE COUNCIL
STATE CAPITOL BUILDING
AUSTIN, TEXAS

524

## APPENDIX B

### ANALYSIS OF THE BILL WHICH PASSED THE HOUSE

| (a)<br>DISTRICT | (b)<br>POPULATION | PERCENTAGE<br>DEVIATION FROM IDEAL | |
|---|---|---|---|
| | | (c)<br>OVER | (d)<br>UNDER |
| 1 | 422,174 | 1.36 | |
| 2 | 440,014 | 5.64 | |
| 3 | 434,263 | 4.26 | |
| 4 | 416,669 | .04 | |
| 5 | 417,174 | .16 | |
| 6 | 433,990 | 4.20 | |
| 7 | 417,283 | .19 | |
| 8 | 408,419 | | 1.94 |
| 9 | 412,059 | | 1.07 |
| 10 | 408,884 | | 1.83 |
| 11 | 401,387 | | 3.63 |
| 12 | 415,016 | | .36 |
| 13 | 421,116 | 1.11 | |
| 14 | 408,742 | | 1.86 |
| 15 | 423,345 | 1.64 | |
| 16 | 394,679 | | 5.24 |
| 17 | 412,706 | | .98 |
| 18 | 418,351 | .44 | |
| 19 | 422,571 | 1.46 | |
| 20 | 416,683 | .04 | |
| 21 | 409,084 | | 1.78 |
| 22 | 417,396 | .21 | |
| 23 | 407,612 | | 2.14 |

## APPENDIX C

### ANALYSIS OF THE BILL WHICH PASSED THE SENATE

| (a)<br>DISTRICT | (b)<br>POPULATION | PERCENTAGE<br>DEVIATION FROM IDEAL | |
|---|---|---|---|
| | | (c)<br>OVER | (d)<br>UNDER |
| 1 | 392,336 | | 5.80 |
| 2 | 405,091 | | 2.74 |
| 3 | 417,283 | .19 | |
| 4 | 420,128 | .87 | |
| 5 | 423,338 | 1.64 | |
| 6 | 439,849 | 4.88 | |
| 7 | 440,175 | 5.76 | |
| 8 | 408,479 | | 1.93 |
| 9 | 400,000 | | 3.96 |
| 10 | 425,400 | 2.13 | |
| 11 | 424,249 | 1.86 | |
| 12 | 448,491 | 7.68 | |
| 13 | 404,355<br>(88,014 Dallas) | | 2.92 |

## APPENDIX C

### ANALYSIS OF THE BILL WHICH PASSED THE SENATE

| (a)<br>DISTRICT | (b)<br>POPULATION | | PERCENTAGE<br>DEVIATION FROM IDEAL | |
|---|---|---|---|---|
| | | | (c)<br>OVER | (d)<br>UNDER |
| 14 | 409,348 | | | 1.72 |
| 15 | 413,264 | | | .78 |
| 16 | 423,839 | | 1.76 | |
| 17 | 408,861 | | | |
| | (90,004 | Tarrant) | | 1.84 |
| 18 | 400,253 | | | 3.90 |
| 19 | 427,811 | | 2.71 | |
| 20 | 397,843 | | | 4.48 |
| 21 | 420,580 | | | |
| | (89,343 | Bexar) | .98 | |
| 22 | 417,396 | | .21 | |
| 23 | 411,308 | | | |
| | (199,965 | Bexar) | | 1.25 |

———◆———

## APPENDIX D

### DECREE

This cause having come on for trial at which all parties, including intervenors, were present by counsel and the Court having heard the evidence and having considered the pleadings, evidence and argument of counsel and being of the view that a decree should be entered in accordance with the opinion of the majority of the Court as reflected in the opinion prepared for the Court by Judge John R. Brown and the special concurrence of Judge Ingraham and the opinion of Judge Noel concurring in part and dissenting in part, which constitutes also the Court's findings of facts and conclusions of law under F.R.Civ.P. 52(a), filed this date, it is therefore ordered, adjudged and decreed by the Court:

FIRST: The Court hereby declares that the present apportionment of Congressional Districts under H.B. 67, Tex.Laws 1965, ch. 349, at 743 [Tex.Rev.Civ.Stat.Ann. art. 197b] is for the present constitutional and therefore valid;

SECOND: Plaintiffs' and Intervenors' prayers that Defendants be enjoined from conducting 1966 congressional elections pursuant to said H.B. 67 is hereby denied.

THIRD: The Court retains jurisdiction of the cause for such other and further orders as may be required and to enable the Texas Legislature, during its 60th regular session convening January 1967 and any special sessions through July 1967, to reconsider and revise as necessary said H.B. 67.